UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X
                                              :

EMA FINANCIAL, LLC, *a Delaware Limited Liability Company*,

                              Plaintiff,

                -v-

APPTECH CORP., *a Wyoming Corporation*,

                              Defendant.

-------------------------------------------------------------------X

           21-cv-06049 (LJL)

           <u>OPINION AND ORDER</u>

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__9/13/2022___

LEWIS J. LIMAN, United States District Judge:

      Plaintiff EMA Financial, LLC ("Plaintiff" or "EMA") brings this action alleging that Apptech Corp. ("Defendant" or "AppTech")[1] breached a securities purchase agreement ("Securities Purchase Agreement" or "SPA"), a related convertible note agreement ("Note"), and a common stock purchase warrant agreement ("Warrant," and together with the Note and the SPA, the "Agreements").  EMA moves for summary judgment and argues that it shsould be granted attorneys' fees and a total of $1,901,999.16 in damages, reflecting $1,473,999.77 for breach of the Note and $427,999.39 for breach of the Warrant.  Dkt. No. 14.  AppTech moves to dismiss the Complaint in its entirety on the basis that the Agreements are void and illegal.  Dkt. No. 20.  For the following reasons, the motion for summary judgment is granted in part and denied in part, and the motion to dismiss is denied.

---

[1] AppTech Corp. is also referred to as "APCX" in the parties' submissions.  For the purposes of convenience, the Court will refer to the Defendant as "AppTech."

## BACKGROUND

The following facts are undisputed, as indicated by EMA's statement submitted pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1 of the Local Rules of the United States District Court for the Southern District of New York (the "Rule 56.1 Statement") and the evidence submitted in connection with the summary judgment motion.[2]  Dkt. No. 28.

On or about November 18, 2020, AppTech, a small public corporation, entered into the Securities Purchase Agreement and two related securities contracts with EMA, an investment firm.  Those contracts were: the Note, issued to EMA for $300,000 in convertible debt, *id.*  ¶ 1, and the Common Stock Purchase Warrant, which provided EMA the option to purchase up to 200,000 shares of AppTech stock, *id.* ¶ 2.

---

[2] AppTech submitted a Rule 56.1 Counterstatement after EMA had already submitted a reply in support of its motion for summary judgment.  Dkt. No. 28.  The Court declines to exercise its discretion to consider AppTech's untimely Rule 56.1 Counterstatement.  *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001).  Although AppTech argues in a letter submitted to the court and at oral argument that its untimeliness should be excused because EMA failed to communicate with AppTech about its Rule 56.1 Statement or provide a word copy of that Statement, nothing about that behavior would prevent EMA from filing its own Counterstatement or, at minimum, requesting an extension of time.  *See* S.D.N.Y. Loc. Civ. R. 56.1(b) (providing that "[t]he papers opposing a motion for summary judgment shall include [the opposing Rule 56.1 Statement]"); *see also Gadsden v. Jones Lang Lasalle Ams., Inc.*, 210 F. Supp. 2d 430, 438 (S.D.N.Y. 2002) (declining to consider late 56.1 statement in opposition and deeming admitted the defendant's timely filed Rule 56.1 statement).  In any event, even in the instances where AppTech disputes key factual statements in EMA's Rule 56.1 Statement, AppTech generally fails to cite evidence in the record showing any dispute of material fact, instead relying on "improper legal argument and unsupported assertions." *Emanuel v. Griffin*, 2015 WL 1379007, at *2 (S.D.N.Y. Mar. 25, 2015) (internal quotation marks omitted).  "In responding to a Rule 56.1 statement, the party opposing the motion for summary judgment is 'required by [the district's] Local Rules to specifically respond to the assertion of each purported undisputed fact by the movant and, if controverting any such fact, to support its position by citing to admissible evidence in the record.' . . . 'If the opposing party then fails to controvert a fact set forth in the movant's Rule 56.1 statement, that fact will be deemed admitted pursuant to the local rule.'" *Baity v. Kralik*, 51 F. Supp. 3d 414, 417–18 (S.D.N.Y. 2014) (first quoting *Risco v. McHugh,* 868 F.Supp.2d 75, 86 n. 2 (S.D.N.Y.2012); and then quoting *Johnson v. IAC/Interactive Corp.*, 2 F. Supp. 3d 504, 507 (S.D.N.Y. 2014)).  Such facts will thus be deemed admitted.

The Note provides that EMA may convert amounts due under the Note, at any time after issuance of the Note, into shares of AppTech common stock.  *Id*. ¶¶ 3, 9.  Under the terms of the Note, EMA may do so by submitting a "Notice of Conversion" to AppTech or AppTech's transfer agent.[3]  *Id*. ¶ 4.  The Note also sets a conversion price that determines the number of shares to be issued.  More specifically, Section 1.2(a) of the Note states that:

> The conversion price hereunder (the "Conversion Price") per share shall equal one dollar ($1) for the one hundred eighty (180) days immediately following the Issue Date, and thereafter shall equal the lower of: (i) the lowest closing price of the Common Stock during the preceding twenty-five (25) Trading Day period ending on the latest complete Trading Day prior to the Issue Date of this Note or (ii) 75% of the lowest trading price for the Common Stock on the Principal Market during the twenty five (25) consecutive Trading Days including and immediately preceding the Conversion Date.

*Id*. ¶ 5; Dkt. No. 12-2 § 1.2(a).  After EMA submits a Notice of Conversion, AppTech is obligated under the Note to issue and deliver certificates for common stock within one business day after receipt of the Notice of Conversion.  Dkt. No. 28 ¶ 6.

The Note also requires that AppTech, "at all times while this Note is outstanding[,] reserve from its authorized and unissued Common Stock a sufficient number of shares, free from preemptive rights, to provide for the issuance of Common Stock upon the full conversion or adjustment of this Note."  *Id.* ¶ 6*;* Dkt. No. 12-2 § 1.3.  Further, AppTech is obligated under the SPA to direct its transfer agent to ensure that such shares are freely available for conveyance without delay, unburdened by any restrictive legends.  Dkt. No. 28 ¶¶ 8, 22.

Like the Note, the Warrant also allows for exercise of its purchase rights at any time in whole or in part after issuance of the Warrant and before its expiration.  *Id*. ¶ 9.  EMA can

---

[3] Transfer agents "work for the security issuer to record changes of ownership, maintain the issuer's security holder records, cancel and issue certificates, and distribute dividends."  U.S. Secs. & Exch. Comm'n, Investor.gov, "Transfer Agents," https://www.investor.gov/introductioninvesting/investingbasics/glossary/transferagents#:~:text=Transfer%20agents%20work%20for%20the,as%20its%20own%20transfer%20agent.

exercise the Warrant by sending a "Notice of Exercise" to AppTech. *Id*. ¶¶ 9–11. AppTech is obligated under the Warrant to deliver those shares within three trading days of delivery of the Notice of Exercise. *Id*. ¶¶ 10–11. AppTech was also required to maintain a reserve of 500% of the total shares of Common Stock issuable upon full exercise of the Warrant. *Id*. ¶ 11.

On July 13, 2021, EMA, in accordance with the terms of the Agreements, submitted two Notices of Conversion seeking to convert the debt that it was owed into 990,791 common shares ("First Notice of Conversion") and 491,262 common shares ("Second Notice of Conversion"). That same day, EMA also submitted a Notice of Exercise to AppTech exercising EMA's right to purchase 480,000 warrant shares of stock, which translated into 287,693 common shares. *Id*. ¶¶ 14–16, Dkt. No. 12-6 (Notice of Exercise). AppTech did not honor the Notices of Conversion and the Notice of Exercise. Dkt. No. 28 ¶ 17. Instead, AppTech sent a letter to its transfer agent indicating AppTech's view that the transaction was "void" and "illegal" and that AppTech would not perform under those Agreements. *Id*. ¶¶ 18–19. EMA subsequently sent notice to AppTech that one or more events of default had occurred under the Agreements. *Id*. ¶ 20.

For both the Note and the Warrant, AppTech failed to maintain an adequate reserve of shares. *Id*. ¶ 13. Section 3.20 of the Note provides that the failure to do so constitutes an "Event of Default" under that agreement. *Id*. ¶ 21. Section 5(d) of the Warrant also obligates AppTech to execute the terms of the Warrant in good faith. *Id*. ¶ 24. The Note provides that a violation of the SPA or the Warrant also constitutes an "Event of Default" under the Note. *Id*. ¶¶ 23–25, 27.

The Note also contains provisions that specify damages and provide for fee-shifting in the case of an "Event of Default." Article III of the Note specifies that, upon default, AppTech becomes liable to EMA in an amount equal to 200% of the sum of the outstanding principal, accrued interest, and default interest, which accrues on unpaid principal and interest at a rate of

24% per year.  *Id*. ¶¶ 26, 29.  The 200% amount under the Note becomes payable "without demand, present or notice, together with all costs, including . . . legal fees and expenses."  *Id*. ¶ 31.  Section 4.5 of the Note also provides that in the case of default, AppTech will pay EMA the "costs of collection, including reasonable attorneys' fees."  *Id*. ¶ 34.  Finally, Section 8 of the Note permits EMA to enforce any and all of EMA's rights under the Note and SPA or otherwise permitted by law.  *Id*. ¶ 28.

**PROCEDURAL HISTORY**

EMA filed its Complaint against AppTech on July 14, 2021.  Dkt. No. 1.  EMA brought four claims against AppTech:  (1) specific performance of the Agreements including, *inter alia*, an increase in the share reserve and immediate delivery of the shares pursuant to the Notices of Conversion and the Notice of Exercise; (2) breach of contract entitling EMA to damages in excess of principal in the sum of  $2,750,000, inclusive of default interest, liquidated damages, and damage as provided by the Agreements;[4] (3) a permanent injunction enjoining AppTech from interfering with the performance of the Agreements and requiring AppTech to deliver the shares as called for; and (4) an award of costs and expenses including reasonable attorneys' fees.

EMA filed its motion for summary judgment on September 3, 2021.  Dkt. No. 11. Apptech filed its motion to dismiss on September 9, 2021.  Dkt. No. 17.  Both parties submitted memoranda of law opposing the others' motions on October 15, 2021, Dkt. Nos. 22–25, and then submitted replies in support of their motions on October 25, 2021, Dkt. Nos. 26–27.  AppTech submitted a counterstatement to EMA's Rule 56.1 Statement on October 29, 2021.  Dkt. No. 28. The Court heard oral argument on September 6, 2022.  Dkt. No. 37.  Following oral argument,

---

[4] EMA clarified during oral argument on the motions that it was no longer seeking $2,750,000 in damages but was seeking $1,952,511.41, as provided in its motion for summary judgment.

both parties submitted letters to the Court providing answers to questions raised during oral argument.  Dkt. Nos. 38, 39.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).  In determining whether there are any genuine issues of material fact, the Court must view all facts "in the light most favorable to the non-moving party," *Holtz v. Rockefeller & Co.*, Inc., 258 F.3d 62, 69 (2d Cir. 2001), and the movant bears the burden of demonstrating that "no genuine issue of material fact exists," *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).  If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). To survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); see also *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

The Southern District's Local Civil Rule 56.1 sets forth specific requirements about how the facts relied upon by the moving party and disputed by the opposing party are to be presented. Any party moving for summary judgment must "annex[ ] to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the

moving party contends there is no genuine issue to be tried." L.R. 56.1(a).  Local Rule 56.1(b), in turn, requires the party opposing the motion to "include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."  L.R. 56.1(b).  All statements in a Local Rule 56.1 submission "must be followed by citation to evidence which would be admissible."  L.R. 56.1(d).  "Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."  L.R. 56.1(c).

To survive a motion to dismiss for failure to state a claim, a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal.  *Twombly*, 550 U.S. at 555, 557.  The ultimate question is whether "[a] claim has facial plausibility, [i.e.,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.

**DISCUSSION**

I.      **Breach of Contract and Broker-Dealer Status**

EMA moves for summary judgment on liability for its claim of breach of contract.  Dkt.

No. 14.  AppTech opposes the motion and argues that the Complaint should be dismissed

because the Agreements are void.  Dkt. Nos. 20, 25.

The elements of a claim for breach of contract under Delaware law[5] are "first, the

existence of the contract, whether express or implied; second, the breach of an obligation

imposed by that contract; and third, the resultant damage to the plaintiff."  *VLIW Tech., LLC v.*

*Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).  There is no genuine dispute of material

fact that agreements existed between EMA and AppTech, Dkt. No. 28 ¶¶ 1–6, that EMA

adequately performed under the Agreements by submitting its Notices of Conversion and

Exercise and, in doing so, imposed an obligation on AppTech under the Agreements, *id.* ¶¶ 14–

16, that AppTech failed to honor those obligations and thereby breached the Agreements, *id.* ¶¶

21–27, or that EMA suffered damages, *id.* ¶¶ 28–34.  EMA has asserted in its Rule 56.1

statement, and AppTech does not properly dispute, that AppTech breached by "(1) failing to

raise the reserve of shares at EMA's request, (2) affirmatively stating that it would not honor

---

[5]  The Agreements are governed by Delaware law.  The Securities Purchase Agreement states
that "[t]his Agreement shall be governed by and construed in accordance with the laws of the
State of Delaware without regard to principles of conflicts of laws thereof or any other State."
Dkt. No. 12-1 § 10(a).  The Warrant provides that "[a]ll questions concerning the construction,
validity, enforcement and interpretation of this Warrant shall be determined in accordance with
the provisions of the Purchase Agreement."  Dkt. No. 12-3 § 5(e).  The Note also provides that
Delaware law shall govern its interpretation.  Dkt. No. 12-2 § 4.6.

EMA's notice of conversion, and (3) actually failing to honor EMA's notice of conversion, dated July 1[3], 202[1]."[6]  Dkt. No. 14 at 8–9.[7]

Instead, in its motion to dismiss and in its opposition to the motion for summary judgment, AppTech asserts as a defense to the breach of contract claim and as grounds for holding the Agreements to be void that the Agreements are "contract[s] for the performance of an illegal act," Dkt. No. 20 at 1, because EMA is "acting as [an] unregistered dealer[]" in violation of Section 15(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), *id*. at 8 (citing 15 U.S.C. § 78o(a)(1)).  AppTech invokes Section 29(b) of the Exchange Act, *id*. (citing 15 U.S.C. § 78cc(b)), and argues that it was not possible for EMA to abide by the terms of the Agreements without violating the federal securities laws because EMA is in the business of selling the securities it buys pursuant to the agreements it enters with issuers.  Dkt No. 20 at 3, 11.  AppTech, in its opposition to summary judgment and during oral argument, further argues that EMA engages in "predatory lending practices to extort companies," Dkt. No. 25 at 16, and warns that EMA "essentially attempts to use the judicial system of the United States to facilitate [its] acting as a predatory lender," *id*.  AppTech argues that EMA's business model is to purchase convertible debt securities and warrants from businesses otherwise struggling to raise capital with the goal of acquiring heavily discounted stock that EMA then "dumps" on the market for a significant profit.  See Dkt. No. 25 at 16 (citing cases).  According to AppTech,

---

[6] EMA listed the date of the "notice of conversion" on "July 17, 2020."  Dkt. No. 14 at 9.  This cannot be correct, as that date is earlier than the execution of the Agreements on November 18, 2020.  *Id*. at 2.  The Court corrects the date on the basis of the record, which indicates that the notice of conversion was filed on July 13, 2021, not July 17, 2020.  Dkt. No. 12-4, 12-5.

[7] AppTech, not having filed a timely Rule 56.1 Counterstatement, failed to dispute these facts. Even if the Court were to consider AppTech's untimely Rule 56.1 Counterstatement, AppTech has not cited anything in the record that would show a genuine dispute of material fact as to any of these elements.  *See supra* note 2.

EMA does not engage in *bona fide* investments but instead takes advantage of financially strapped issuers.

EMA, in response, argues that is not a "dealer," but a "trader," and that there is nothing in the Agreements that would require EMA to register as a dealer.  *See* Dkt. No. 23 at 3 (opposition to motion to dismiss); Dkt. No. 26 at 3–8 (reply in support of summary judgment).  It also argues that, regardless of whether EMA was required to register as a broker-dealer, AppTech is required to perform its obligations under the Agreements.  *See* Dkt. No. 26 at 6–8.  It argues that there is nothing in the Agreements that would require EMA, even if it were required to register as a broker-dealer, to violate the terms of the Exchange Act.  *See* Dkt. No. 23 at 7–8; Dkt. No. 26 at 7.

For the following reasons, the Court concludes that it need not decide whether EMA is required, as a general matter, to register as a broker-dealer.  Even assuming that EMA was required to register as a broker-dealer, there is nothing in the Agreements that would require EMA to engage in conduct that violates the securities laws.  Accordingly, the Court denies AppTech's motion to dismiss and grants EMA's motion for summary judgment on liability.

Under Section 15(a) of the Exchange Act, "[i]t shall be unlawful for any broker or dealer . . . to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security . . . unless such broker or dealer is registered."  15 U.S.C. § 78o(a)(1).  A "dealer" is defined by statute as "any person engaged in the business of buying *and selling* securities (not including security-based swaps, other than security-based swaps with or for persons that are not eligible contract participants) for such person's own account through a broker or otherwise."  15 U.S.C. § 78c(a)(5)(A) (emphasis added).  It does "not include a person that buys or sells securities . . . for such person's own account, either individually or in a fiduciary capacity, but

not as a part of a regular business." *Id*. § 78c(a)(5)(B).  "Whether an individual falls within this definition . . . requires analysis of a variety of factors, including whether the individual: 'advertises or otherwise lets others know that it is in the business of buying and selling securities'; 'makes a market in, or quotes prices for both purchases and sales of, one or more securities'; and/or 'provides services to investors, such as handling money and securities, extending credit, or giving investment advice.'"  *Dervan v. Gordian Grp. LLC*, 2017 WL 819494, at *10 (S.D.N.Y. Feb. 28, 2017) (Nathan, J.) (alterations adopted).

> With respect to the "illegality" of contracts, the Exchange Act provides that:
>
> Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract (including any contract for listing a security on an exchange) heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract . . . .

15 U.S.C. § 78cc(b).  Such contracts in violation of the Exchange Act are "voidable at the option of the innocent party," *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 387 (1970), and such party has a "right to rescind" the contract, *Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 19 (1979).  "To state a claim for rescission under 15 U.S.C § 78cc(b), a party must show 'that (1) the contract involved a prohibited transaction, (2) he is in contractual privity with the opposing party, and (3) he is in the class of persons the Act was designed to protect.'"  *Ema Fin., LLC v. Vystar Corp.*, 336 F.R.D. 75, 81 (S.D.N.Y. 2020) (quoting *RWP Consol., L.P. v. Salvatore*, 534 F. Supp. 2d 364, 368 (D. Conn. 2008)) (internal alterations omitted).

The parties cross swords on whether there is a triable issue that EMA is a broker-dealer. AppTech argues that EMA is required to register as a broker-dealer because publicly available information demonstrates that it has purchased at least 170 promissory notes and/or warrants

from at least 128 issuers, which it then converted into shares of stock and sold into the public market on an ongoing and regular basis. Dkt. No. 20 at 11. From those facts, it would have the Court conclude as a matter of law (or at least find to be a triable issue) that EMA is "'engaged in the business' of buying and selling securities." *Id.* (quoting 15 U.S.C. § 78c(a)(5)(A)). EMA denies that it should be defined as a broker-dealer but instead states that it should be categorized as trader. Dkt. No. 23 at 3. It points to guidance by the Securities and Exchange Commission ("SEC") that defines a "trader" as a "party that buys and sells securities for its own accounts but does not fall within the definition of a dealer and is not required to registered with the SEC." *Id.* at 4 (citing Nat'l Council of Sav. Institutions, SEC No-Action Letter, 1986 WL 67129, at *3–4 (July 27, 1986)). Among the factors the SEC looks to in determining whether a party is a dealer is if it: buys and sells securities as part of its regular business, contemporaneously and continuously buys and sells securities on the market, handles other people's money or securities and invests on their behalf, makes a market in securities, buys and sells securities on behalf of a regular clientele, renders investment advice, and whether individuals employ the party to earn a return on their behalf. Nat'l Council of Sav. Institutions, 1986 WL 67129, at *1. EMA denies that it satisfies any of these criteria: its regular business is financing companies in exchange for convertible debt, not buying and selling securities, and it does not contemporaneously buy and sell securities for investment purposes, handle other people's money or securities, make a market, buy or sell securities for others, or render investment advice. Dkt. No. 23 at 5.

The Court need not determine whether AppTech has identified sufficient facts to create a triable issue that EMA is required to register as a broker-dealer. Even an unregistered broker-dealer is permitted to enter contracts and have those contracts honored. Under Section 29(b), "only unlawful contracts may be rescinded, not unlawful transactions made pursuant to lawful

contracts." *Zerman v. Jacobs*, 510 F. Supp. 132, 135 (S.D.N.Y.) (Weinfeld, J.), *aff'd*, 672 F.2d

901 (2d Cir. 1981); *see also Vystar Corp.*, 336 F.R.D. at 81 ("Section 29(b) can only 'render

void those contracts which by their terms violate the Act or the rules and regulations thereunder,

for it is only such contracts which are made "in violation of," or "the performance of which

involves the violation of" the statute and the rules and regulations thereunder.'" (quoting *Slomiak*

*v. Bear Stearns & Co.*, 597 F. Supp. 676, 682 (S.D.N.Y. 1984))); *Slomiak*, 597 F. Supp.at 682

("[The] focus on contracts which 'by their terms' are illegal may fairly be interpreted . . . [to]

foreclose the remedy of rescission where, as here, the violation complained of is *collateral or*

*tangential* to the contract between the parties." (emphasis added)).  A party cannot enjoy the

benefits of a contract and then relieve itself of any obligations under that contract on the sole

basis that its counterparty engages in business as a broker-dealer and should have registered with

the SEC.

AppTech argues that the Agreements require EMA to engage in illegal acts because

EMA sells the securities it purchases under the Agreements.  Dkt. No. 20 at 2, 3, 11.  In that

form, AppTech argues, EMA is in the business of "buying and selling" securities.  But there is

nothing in the Agreements that requires EMA either to convert the debt that it obtains pursuant to

the Agreements or—if it converts the debt into securities—to sell those securities on the market.

The Agreements give EMA the *option* to exercise its conversion right.  Depending on the price

of the stock at such time that EMA is able to exercise, and whether EMA will realize value from

the stock (either in the short term or over the long term), it may or may not make sense for EMA

to exercise that option.  And importantly, there is nothing in the Agreements that requires EMA

to sell the securities it obtains pursuant to the exercise of its conversion right.  EMA has the

option either to sell or to hold.  Indeed, at oral argument, AppTech was unable to point to a

single provision in the Agreements that would require EMA to sell.  Thus, the Agreements are

valid.  AppTech cannot avoid its obligations under the Agreements on the basis that EMA should

have registered.

For identical reasons, numerous other courts in this District have reached the same

conclusion with respect to similar contracts and at least in one instance, with respect to a contract

involving EMA.  Indeed, AppTech's argument has been uniformly rejected in this District for

nearly half a century.  *See Ema Fin., LLC v. Vystar Corp.*, 336 F.R.D. 75, 81 (S.D.N.Y. 2020)

("[A]ssuming *arguendo* that the selling of converted shares made [EMA] a broker-dealer, the

selling of those shares was not required by the contract."); *LG Cap. Funding, LLC v. ExeLED*

*Holdings, Inc.*, 2018 WL 6547160, at *5 (S.D.N.Y. Sept. 28, 2018) (Sullivan, J.) ("[N]either the

Note nor the SPA require LG to take any action that would violate this statute."); *Omega*

*Overseas Partners, Ltd. v. Griffith*, 2014 WL 3907082, at *4 (S.D.N.Y. Aug. 7, 2014) (Sullivan,

J.) (same and citing cases); *Frati v. Saltzstein*, 2011 WL 1002417, at *6 (S.D.N.Y. Mar. 14,

2011) (same); *Pompano-Windy City Partners, Ltd. v. Bear Stearns & Co.*, 794 F. Supp. 1265,

1288 (S.D.N.Y. 1992) (same);  *Slomiak v. Bear Stearns & Co.*, 597 F. Supp. 676, 682 (S.D.N.Y.

1984) (same); *Zerman*, 510 F. Supp. at 135; *cf. Gordian Grp. LLC*, 2017 WL 819494, at *10

(denying motion to dismiss and finding the need for a fact-specific inquiry when there was a

contractual provision that could include such illegal behavior).

These cases have soundly assessed the text and Congressional intent undergirding

Section 29(b).  As Judge Friendly explained, "[d]espite the Draconian language, § 29(b) does not

provide a pat legislative formula for solving every case in which a contract and a violation

concur.  Rather it was a legislative direction to apply common-law principles of illegal bargain,

enacted at a time when it seemed much more likely than it might now that courts would fail to do

this without explicit legislative instruction." *Pearlstein v. Scudder & German*, 429 F.2d 1136,

1149 (2d Cir.1970) (Friendly, J., dissenting).  This common law principle of illegal contract

merely requires that "the contract would be invalid . . . where the contract was made illegally or

requires illegal performance."  *Griffith*, 2014 WL 3907082, at *3.  The text of Section 29(b) also

supports this interpretation.  *See Drasner v. Thomson McKinnon Sec., Inc.*, 433 F. Supp. 485,

501–02 (S.D.N.Y. 1977) (interpreting the terms "made in violation of" and "the performance of

which involves the violation of" in Section 29(b) to only render void those contracts "which by

their terms violate the Act").

AppTech urges the Court to not follow the results reached in each of those cases because

it says that it now has presented evidence that it is the "business model" of EMA to regularly

execute promissory notes and warrants that it then converts into stock.[8]  Dkt. No. 20 at 11.

AppTech cites a letter submitted by special counsel to AppTech (not counsel of record in this

matter) that listed such transactions.  Dkt. No. 18-4 at 2–7.  The letter, however, only lists the

issuer and "Date(s) of EMA Note" and does not indicate whether EMA converted the debt into

shares or whether EMA sold those shares.  *Id.*  AppTech also submits "filed records in relation to

60 of [those] transactions."  Dkt. No. 19 ¶ 4.  Some, but not all, of these filings describe

instances in which EMA sought to exercise or convert its shares, often in the context of ensuing

litigation.  Many only describe that the issuers signed convertible debt and warrant agreements

with EMA.  The evidence thus does not establish that EMA invariably converts and immediately

sells the shares it obtains.  But even if the evidence was sufficient to show that EMA engaged in

---

[8] AppTech argues in its reply brief on the motion to dismiss, in response to EMA's denial that it is a dealer, that EMA received transaction-based compensation in exchange for signing the agreements.  But such commissions do not categorically establish broker-dealer status and would not suffice for granting the motion to dismiss.  *See Dervan v. Gordian Grp. LLC*, 2017 WL 819494, at *11.

activity as a broker-dealer or that it consistently sold upon exercising, it does not follow from the fact that EMA previously has chosen to exercise and sell in connection with other contracts that the Agreements should be considered to be void.  Such agreements that are not void at their inception because they do not require EMA to engage in conduct that would violate the securities laws do not become void because EMA subsequently decides, in its discretion, to sell rather than to hold.  *See Vystar Corp.*, 336 F.R.D. at 82 ("Vystar can rescind the contracts only if they were illegal at the time they were made, not because [EMA] later engaged in an illegal transaction."); *see also Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 207 (3d Cir. 2006) (finding that subsequent "sales are too attenuated to establish a claim under Section 29(b)").  It follows necessarily that EMA's agreement with AppTech is not void simply because in certain or all of those other situations EMA chose to sell rather than to hold.  In each instance, as in the case of the Agreements, the decision whether to hold or to sell is that of EMA alone.  There is nothing in the Agreements that would require it to sell and thus nothing in the Agreements that would make them "illegal contracts," *Zerman*, 510 F. Supp. at 135.

Indeed, AppTech's argument admits of no limiting principle.  What if, in the first three agreements EMA signs, it subsequently chooses to exercise and then immediately sell?  Does that give the fourth counterparty a free pass to enjoy the funds EMA loans it without having to satisfy its end of the bargain?  What if it is ten?  Does that mean that the first nine note issuers have to satisfy their obligations to EMA but not the tenth?  And what if EMA chooses to sell in 90% of the cases but not in the remaining 10%, or in 75% but not the remaining 25%?  What is the tipping line that makes the contract an illegal contract rather than a lawful contract pursuant to which EMA engaged in an unlawful transaction?  The lesson of the cases is that whether a contract is unlawful and thus may be voided is addressed by the courts as Section 29(b)

16

addresses it—case-by-case on the terms of the contract sought to be voided and not on the basis of some other contracts that the non-breaching party has made with other third parties.

The two out-of-circuit cases upon which AppTech relies are not to the contrary.  In *Regional Properties Inc. v. Financial & Real Estate Consulting Co.*, 678 F.2d 552 (5th Cir. 1982), "[t]wo real estate developers  . . . entered into a number of agreements with a securities broker whereby the broker agreed to structure limited partnerships and market the limited partnership interests."  *Id*. at 554.  The Fifth Circuit held that the "developers were entitled to rescind their agreements with the broker under the contract-voiding provision contained in the [Exchange] Act."  *Id.*  In support of that proposition, the Fifth Circuit stated that "Section 29(b) does not render void only those contracts that 'by their terms' violated the Act," reasoning that if that were true, then "[the] statute . . . would be so narrow as to be a waste of the congressional time spent in its enactment."  *Id*. at 560.  The Fifth Circuit also reasoned that doing so would read the word "necessarily" into the statute and "generate[] difficult problems of proof."  *Id*. Notwithstanding some of its broad language, however, "[t]he illegality involved in *Regional* . . . was inseparable from the performance of the contract plaintiff was seeking to rescind. . . . While the contract [in *Regional*] did not 'by its own terms,' or *in vacuo*, violate the Act, there could be no performance under the contract without violating the Act."  *Slomiak*, 597 F. Supp. at 682. The contrary is true here.  EMA could perform the Agreements without violating the securities laws.

The second case, *EdgePoint Capital Holdings, LLC v. Apothecare Pharmacy, LLC*, 6 F.4th 50 (1st Cir. 2021) ("*Apothecare*"), involved an agreement in which an investment banking firm agreed to "assist [a medical company] *in the sale of all or part of the Company*."  *Id*. at 54 (emphasis in original) (quoting the agreement at issue).  Implementation of that contract also

included sending a confidential information memorandum ("CIM") to prospective purchasers considering acquiring the medical company. *Id*. at 54. The firm had two arms: EPCH, which was not registered as a broker-dealer and handled assets sales, and EPCA, which was a registered broker-dealer and handled stock sales. *Id.* at 52. To avoid taxes that the Financial Industry Regulatory Authority ("FINRA") imposes on transactions with broker-dealers, the investment firm structured the agreement so that the medical company formally engaged the non-broker-dealer (EPCH), but the sell-side agreement it entered into with the medical company bound EPCH "and all related affiliates" and engaged them to assist the seller "in the sale of all or part of the Company *or* its assets" and not just to engage in an asset sale. *Id.* at 53–54 (emphasis added). EPCH, moreover, admitted that it assigned contracts to EPCA well after EPCH had started its efforts on behalf of a client if EPCH came to believe that the transaction would involve the sale of securities. *Id.* at 53. After EPCH drafted the CIM, it contacted seven companies in an attempt to induce the purchase or sale of the medical company's equity. *Id.* at 59. The CIM issued by EPCH in connection with its marketing efforts stated that the medical company was looking for a prospective buyer of the company, that buyers could specify whether they were interested in a stock transaction, and "falsely listed EPCA as [the medical company's] representative, which would wrongly reassure potential buyers that a registered broker was at that time handling the purchase and sale." *Id.* at 59–60. In those circumstances, the First Circuit concluded that the investment firm, by choosing to use its unregistered arm "to induce a type of transaction expressly contemplated to include a possible securities transaction," had signed an illegal agreement which—as a result—was voidable. *Id.* at 63. The agreement did not just give the investment firm the option whether to sell securities or to engage in an asset transaction. On its face, it required the investment firm (and its unregistered arm) to effect a sale of securities if

such was in the interest of the medical company seller. *See id.* at 61 ("EPCH's attempts to induce the sale of securities were inseparatable from the contract's central purpose of selling Apothecare.")  In this case, by contrast, EMA enjoyed the unfettered discretion whether to convert and then whether to sell or to hold.  AppTech could not compel EMA to do either.  In other words, the scope of performance under the Agreements does not implicate—let alone require—any of the prohibited actions that were at issue in *Apothecare* or *Regional Properties*.

## II.     Damages

EMA also moves for summary judgment as to damages, seeking $1,952,511.41 in total,[9] reflecting $1,473,999.77 from AppTech's breach of the Note, $427,999.39 from breach of the Warrant, $45,552.65 in default interest, and $4,960.10 in statutory interest. [10]  AppTech responds that Section 3.20 of the Note, which describes payments in the case of an Event of Default, is a liquidated damages clause that is "punitive and unenforceable" because it is "plainly disproportionate."  Dkt. No 25 at 14–15.  Although the Court concludes that Section 3.20 is valid, it denies EMA's specific request for damages of $1,952,511.41.

### A.     EMA's Assessment of Damages

#### 1.     Damages from Breach of the Note

EMA reaches its damages figure of $1,473,999.77 for breach of the Note through the following calculations.  EMA first determines the principal and cumulative interest remaining on the Note at the time of breach.  Importantly, EMA also submitted three prior Notices of

---

[9] The true sum of the listed amounts is $1,952,511.91.  The $0.50 difference is not material to the outcome of this opinion.

[10] EMA, in its motion for summary judgment, relies only on the First Notice of Conversion on July 13, 2021 and the Notice of Exercise, also on July 13, 2021, in confirming that "plaintiff's damages total $1,901,999.16."  Dkt. No. 14 at 14.  In a letter sent to the Court on September 8, 2022, EMA explained that the Second Notice of Conversion on July 13, 2021 was included as an "alternative should the Court not agree to award the liquidated damages . . . . provided for in Section 3.2[0]."  Dkt. No. 39 at 2 n.2.

Conversion on May 28, June 8, and June 14, 2021.[11]  AppTech honored the May 28 and June 8

Notices of Conversion at a conversion price of $0.625 per share, converting approximately

$20,500 in Note principal (after fees for legal services and transfer agents) to 36,000 shares.

Dkt. No. 39-5 at 2 (EMA spreadsheet documenting these transactions); Dkt. No. 24 ¶¶ 5–6

(Moriarty Affidavit confirming these transactions).  AppTech, however, refused to honor the

June 14 Notice of Conversion.  EMA, for the purposes of its damages calculations, refers to June

14, 2021 as the default date.  Dkt. No. 29 at 2 n.2 (EMA explaining in a letter that "although

Defendant defaulted as early as April 13, 2021 by failing to maintain the required reserves, EMA

did not calculate either default interest or liquidated damages . . . until the later failure to honor

the June 14, 2021 conversion").  Thus, on June 14, 2021, the Note's total remaining principal

was $279,500, reflecting the reduction attributable to the honored conversions.  The accrued

interest at that point—which accumulated at a rate of 12% per year—was $20,435.34.  Dkt. No.

39-5.  The total remaining principal and accrued interest was $299,935.34 on June 14, 2021.

　　　　EMA then applies the second paragraph of Section 3.20 of the Note, which is triggered

"[u]pon the occurrence of any Event of Default specified in Article III of the Note," Dkt. No. 12-

2 § 3.3.  Events of Default in Article III include the failure to honor a Notice of Conversion, *id*.

§ 3.2, and the failure to maintain reserves, *id*.  Section 3.20 provides that AppTech, upon default,

shall pay an amount that includes double the principal, accrued interest, and "Default Interest."[12]

The relevant portion of Section 3.20 reads as follows:

---

[11] These are distinct from the "First Notice of Conversion" and the "Second Notice of
Conversion," as termed by EMA, which both occurred on July 13, 2021.

[12] Section 3.20 also provides that AppTech was obligated to pay EMA a doubled amount of
amounts owed "pursuant to Section . . . 1.4(g)," Dkt. No. 12-2 § 3.20, which obligates AppTech
to pay "$250.00 per day in cash, for each day beyond the Deadline that [AppTech] fails to
deliver such Common Stock."  EMA did not raise this daily payment provision in its motion and
confirmed at oral argument that it was not seeking to enforce this provision.

> Upon the occurrence of any Event of Default specified in Article III of the Note, the Note shall become immediately and automatically due and payable without demand, presentment or notice and the Borrower shall pay to the Holder, in full satisfaction of its obligations hereunder, an amount equal to . . . (i) 200% times the sum of (w) the then outstanding principal amount of this Note plus (x) accrued and unpaid interest on the unpaid principal amount of this Note to the date of payment (the "Mandatory Repayment Date") plus (y) Default Interest, if any, on the amounts referred to in clauses (w) and/or (x) plus (z) any amounts owed to the Holder pursuant to Section and 1.4(g) hereof (the then outstanding principal amount of this Note to the date of payment plus the amounts referred to in clauses (x), (y) and (z) shall collectively be known as the "Default Sum").

Dkt. No. 12-2 § 3.20.  In accordance with subsection (i), EMA doubles the "then outstanding principal amount of the note" and accrued interest of $299,935.34 to yield a payment of $599,870.68.

EMA then adds in Default Interest.  The Default Interest provision in the Note states that "[a]ny amount of principal or interest on this Note which is not paid when due shall bear interest at the rate of twenty-four (24%) per annum from the due date thereof until the same is paid."  *Id.* at 1.  EMA clarifies in its post-argument letter that it calculated the accumulated Default Interest to be $11,438.16 between June 14, 2021 and July 13, 2021.[13]  The $11,438.16 figure reflects a 24% per annum rate applied to the *doubled* sum of principal and interest over a time period of 29 days.  With the doubled principal and accrued interest of $599,870.68, the resulting payment figure is $611,308.84.  After applicable fees for transfer agents and legal services, *see* Dkt. No. 12 §§ 1.2(a), 1.4(d), the final payment sum is $612,308.84.

Finally, EMA claims that the third paragraph of Section 3.20 allows it to convert its debt at this doubled sum.  The third paragraph of Section 3.20 states that:

---

[13] EMA argued in its motion that $11,438.16 was a result of "interest under the Note *at a rate of 12%* totaling $11,438.16," Dkt. No. 14 at 10 (emphasis added), but EMA appears to correct itself in its letter submitted on September 8, 2022, with the spreadsheet noting that the $11,438.16 is instead a result of the "Default Interest" rate, Dkt. No. 39-5 at 2, which was 24%, Dkt. No. 12-2 at 1.

> The Holder shall have the right at any time after the occurrence of an Event of Default, to require the Borrower, to immediately issue, *in lieu of the Default Amount and/or Default Sum, the number of shares of Common Stock of the Borrower equal to the Default Amount and/or Default Sum divided by the Conversion Price then in effect*, subject to issuance in tranches due to the beneficial ownership limitations provided in this Note.

Dkt. No. 12-2 § 3.20.  In other words, EMA interprets this paragraph to allow it convert the final payment sum of $612,308.84 into shares.

EMA then calculates the conversion rate of the debt.  EMA, in its motion for summary judgment, asserts that it would be entitled to convert its rate at a 40% discount price.  The specific terms of the conversion rate are found in Section 1.2(a):

> The conversion price here under (the "Conversion Price") per share shall equal one dollar ($1) for the one hundred eighty (180) days immediately following the Issue Date, and thereafter shall equal the lower of: (i) the lowest closing price of the Common Stock during the preceding twenty-five (25) Trading Day period ending on the latest complete Trading Day prior to the Issue Date of this Note or *(ii) 75% of the lowest trading price for the Common Stock on the Principal Market during the twenty five (25) consecutive Trading Days including and immediately preceding the Conversion Date.*  In order to determine the lowest trading price for the Common Stock on the Principal Market during the twenty-five (25) consecutive Trading Days, a minimum daily trading volume of 1,000 must be traded on the day which determines the Conversion Price.  The Holder, or any of the Holder's affiliates may not trade on the day which determines the Conversion Price.  If an Event of Default under Section 3.9 of the Note has occurred, Holder, in its sole discretion, may elect to use a Conversion Price equal to the lower of: (i) the lowest traded price of the Common Stock on the Principal Market on the Trading Day immediately preceding the Issue Date or (ii) 75% of either the lowest traded price or the closing bid price, whichever is lower for the Common Stock on the Principal Market during any Trading Day in which the Event of Default has not been cured.

Dkt. No. 12-2 § 1.2(a) (emphasis added).  EMA here relies on the methodology within subsection (ii), which focuses on the 75% of the lowest price for the stock during the twenty-five days preceding the conversion date.  By default, EMA is entitled to a 25% discount on the price.

Section 1.2(a) of the Note also provides for two ways to gain two additional 15% discounts on top of the 25%, leading to a potential total discount of 55%.  The first trigger for a discount, which EMA does not invoke, states:

> If the Borrower's Common stock is chilled for deposit at [Depository Trust Company], becomes chilled at any point while this Note remains outstanding or deposit or other additional fees are payable due to a Yield Sign, Stop Sign or other trading restrictions, or if the closing price at any time falls below $0.10 (as appropriately and equitably adjusted for stock splits, stock dividends, stock contributions and similar events), then an additional 15% discount will be attributed to the Conversion Price for any and all Conversions submitted thereafter.

*Id*. § 1.2(a).  The second trigger for a discount, which EMA invokes in its letter to the Court,[14]

provides:

> [I]f the Company ceases to be a reporting company pursuant to the 1934 Act at any time after the Issue Date or *if the Note cannot be converted into free trading shares after 181 days from the issuance date, an additional 15% discount will be attributed to the Conversion Price* for any and all Conversions submitted thereafter.

*Id*. (emphasis added).  This provision and the default 25% discount combined allow EMA to

purchase shares at a 40% discount.

EMA then calculates the number of shares that the final payment sum of $612,308.84

would be entitled to purchase at a conversion rate reflecting a 40% discount.  According to

EMA, the lowest trading price during the previous twenty-five trading days, in accordance with

the conversion formula in Section 1.2(a), was $1.03.[15]  Applying a 40% discount to $1.03 yields

a conversion rate of $0.618.  Application of this price to the final payment sum of $612,308.84

yields 990,791 shares of common stock.  Dkt. No. 14 at 10.

---

[14] Although EMA asserts that it should be allowed to use a 40% discount price in its motion for summary judgment, Dkt. No. 14 at 10, it also represented at oral argument that it did not seek to apply any additional 15% discounts.  EMA clarified its position in its September 8, 2022 letter on which of the 15% discounts it claimed was applicable here. Dkt. No. 39 at 1.

[15] EMA references "Exhibit G" attached to its accompanying Declaration of Felicia Preston, but Exhibit G does not include any evidence that the lowest trading price was $1.03 in the 25 days prior to June 14.  Exhibit G instead is a copy of the June 14 Notice of Conversion and provides a conversion price of $0.625, as opposed to $0.618.  Because the Court ultimately concludes that further briefing is required on damages and denies summary judgment on EMA's specific damages figures, EMA's lack of evidence for the $0.618 price is immaterial to the Court's decision.

EMA then determines the value of the shares according to the average price in the stock market on the day after the breach.  EMA relies on a value weighted average price ("VWAP") on the business day after shares were due, which was $1.4877 on July 15, 2021.  Dkt. No. 12-7. Multiplying $1.4877 by 990,791 shares of stock yields a pre-interest total damages figure of $1,473,999.77 for breach of the Note.

EMA then argues that is entitled to an 24% "Default Interest" rate on top of this amount for the period between June 14 default and the July 13 Notices of Conversion.  Dkt. No. 14 at 10. It applies the 24% Default Interest rate to the pre-interest total damages figure beginning on July 15, 2021.  From that date to August 31, 2021, the Default Interest rate added another $45,552.65 in interest to the total payment for the breach of the Note.  In total, EMA asks for 1,519,552.42 for breach of the Note.

## 2.      Damages from Breach of the Warrant

EMA's calculations for damages for the Breach of the Warrant are more straightforward. The total value of the Warrant is $300,000 because the Warrant guaranteed 200,000 shares at a $1.50 exercise price.  Dkt. No. 12-3 at 1, § 2(c).  As previously noted, EMA exercised Notices of Conversion on May 28 and June 8 at a conversion price of $0.625 per share.  Dkt. No. 39-5 at 2; Dkt. No. 24 ¶¶ 5–6.  AppTech issued shares of common stock to satisfy those notices. Accordingly, AppTech's honoring of the Notices of Conversion and its issuance of stock to satisfy them triggered Section 3(b) of the Warrant, an "anti-dilution clause," Dkt. No. 39 at 1, which provides the following:

> If the Company or any Subsidiary thereof, as applicable, at any time while this Warrant is outstanding, shall sell or grant any option to purchase, or sell or grant any right to reprice, or otherwise dispose of or issue (or announce any offer, sale, grant or any option to purchase or other disposition) any Common Stock or securities entitling any Person, except employees or contractors for services, to

24

> acquire shares of Common Stock (*upon conversion, exercise or otherwise*) *at an effective price per share less than the then Exercise Price (such lower price, the "Base Share Price"* and such issuances collectively, a "Dilutive Issuance") . . . then the Exercise Price shall be reduced and only reduced to equal the Base Share Price, *and the number of Warrant Shares issuable hereunder shall be increased such that the aggregate Exercise Price payable hereunder*, after taking into account the decrease in the Exercise Price, shall be equal to the aggregate Exercise Price prior to such adjustment.

Dkt. No. 12-3 § 3(b) (emphasis added).  Although the previous Exercise Price was $1.50 per share, *id*. § 2(c), the effect of the issuance of the stock necessary to satisfy the Notes of Conversion at $0.625 per share in effect "reset[] the warrant amount to 480,000 shares," Dkt. No. 39 at 1, because only that warrant amount would maintain the total value of the Warrant at $300,000.

Because EMA opted for a cashless exercise of its Warrant, Section 2(d) determined the total number of warrant shares issuable to EMA.  The equation for the final shares is described as follows:

> [T]he Holder shall be entitled to receive a certificate for the number of Warrant Shares equal to the quotient obtained by dividing [(A-B) (X)] by (B), where:
>
> (A) = the Market Price (as defined below);
>
> (B) = the Exercise Price of this Warrant (as adjusted); and
>
> (X) = the number of Warrant Shares issuable upon exercise of this Warrant in accordance with the terms of this Warrant by means of a cash exercise rather than a cashless exercise.
>
> "Market Price" shall mean the closing sale price per share of Common Stock on the principal market where the Common Stock is traded on the Trading Day immediately preceding delivery of the Notice of Exercise or the Closing Date, whichever is greater.

Dkt. No. 12-3 § 2(d).  After accounting for stock splits, the Market Price ("A") on July 12, 2021 was $1.56.  The exercise price of the Warrant ("B") was $0.625.  The difference is $0.935.  The number of Warrant Shares issuable by cash exercise was 480,000.  Multiplying 480,000 by

$0.935 yields a sum of $448,800.  According to EMA, these inputs lead to a total of 287,692 shares.  Using the same VWAP as in the case of the Note, EMA then multiplies 287,692 shares by $1.4877 to yield a pre-interest damages figure of $427,999.39.   Dkt. No. 39 at 2.

EMA then argues that is entitled to an 9% "statutory interest" rate for damages from the date of default on July 15, 2021.[16]  Dkt. No. 14 at 11.  From that date to August 31, 2021, the statutory damages rate added another $4,960.10 in interest to the total payment for the breach of the Warrant.  In total, EMA asks for $432,959.49 for breach of the Warrant.

### B.    The Court's Assessment of Damages

#### 1.    Damages from Breach of the Note

With respect to Section 3.20, EMA argues for summary judgment that the Note entitles EMA enforce the "doubling" effect of Section 3.20.  AppTech argues that Section 3.20 "is punitive in nature and thus is unenforceable as a liquidated damages clause."  Dkt. No. 25 at 14.  In particular, AppTech notes that the "damages total in the amount of $1,901,999.16," *id*., and that "a liquidated damages clause that provides for damages in an amount that is more than six

---

[16] EMA does not cite a provision in its motion as to the specific statutory provision that would provide a 9% interest rate on damages.  Presumably, EMA is referring to N.Y. C.P.L.R. § 5004(a), which provides that "[i]nterest shall be at the rate of nine per centum per annum, except where otherwise provided by statute."  *See also id.* § 5001 (providing when such interest accrues); Dkt. No. 14 at 11 (EMA's memorandum citing N.Y. C.P.L.R. § 5001(b) in support of its Default Interest rate calculation).  To the extent that EMA relies on New York law, it is mistaken.  Delaware law governs this matter.  *See supra* note 5.  In addition, prejudgment interest for damages are substantive issues under both Delaware and New York law.  *See*, *e.g.*, *Certain Underwriters at Lloyd's London v. Nat'l Installment Ins. Servs., Inc.*, 2007 WL 4554453, at *21 (Del. Ch. Dec. 21, 2007) ("[T]he application of prejudgment interest is generally an issue of substantive law."); *MCI Worldcom Network Servs., Inc. v. Pelcrete Constr., Inc.*, 2006 WL 1388490, at *3 (S.D.N.Y. May 8, 2006) ("The award of prejudgment interest is a substantive issue governed by [N.Y. C.P.L.R.] 5001.");  Restatement (Second) § 207 cmt. e ("The local law of the state selected by application of the rule of this Section determines whether plaintiff can recover interest, and, if so, the rate, upon damages awarded him for the period between the breach of contract and the rendition of judgment.").  Delaware law provides for prejudgment interest at 5% over the Federal Reserve discount rate, with exceptions inapplicable here.  Del. Code Ann. tit. 6, § 2301.

times the principal [of $300,000] is plainly disproportionate," *id.* at 15.  EMA argues in response

that AppTech cites nothing in the record to support its contention, did not "challenge the case

law cited or dispute the breaches," and characterizes AppTech's argument as essentially stating

that "because [AppTech's] actions caused such a large number of damages, the Court should not

award Plaintiff the contractual expectation damages Plaintiff is entitled to."  Dkt. No. 26 at 9.[17]

For the following reasons, the Court concludes that neither party is entirely correct.  EMA is

correct that Section 3.20 is enforceable, but it does not provide the damages EMA seeks, while

AppTech's argument that the clause is an impermissible penalty rests on a misconstruction of the

provision.  Thus, although the Court rejects the argument that Section 3.20 is unenforceable, it

denies EMA's motion for summary judgment on damages.

 "[L]iquidated damages, by definition, are damages paid in the event of a breach of a

contract." *Brazen v. Bell Atl. Corp.*, 695 A.2d 43, 47 (Del. 1997);  *see also Unbound Partners*

*Ltd. P'ship v. Invoy Holdings Inc.*, 251 A.3d 1016, 1033 (Del. Super. Ct. 2021) ("A liquidated

damages provision may be best described as any 'contract provision that requires payment in the

event of a termination.'"); *cf. U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 369 F.3d 34, 71

(2d Cir. 2004) ("[A] liquidated damages provision is an estimate made by the parties at the time

they enter into their agreement, of the extent of the injury that would be sustained as a result of

breach of the agreement.").  The salutary effect of the clause is to relieve the parties—on both

sides—of the often arduous and sometimes unpredictable exercise of litigating the precise sum of

actual damages after-the-fact in a court proceeding where certain and definite damages are not

susceptible of calculation with a fair amount of precision.  *See Delaware Bay Surgical Servs.*,

---

[17] The parties agreed that Delaware law would govern their disputes over the Agreements.  *See*
*supra* note 5.

*P.C. v. Swier*, 900 A.2d 646, 650 (Del. 2006) (quoting *S.H. Deliveries, Inc. v. TriState Courier &*
*Carriage, Inc.*, 1997 WL 817883, at *2 (Del. Super. Ct. May 21, 1997))

In addition, under Delaware law, "[t]he Court . . . will presume a liquidated damages
provision is valid." *Unbound Partners Ltd. P'ship*, 251 A.3d at 1034 (citing *Kold, LLC v.*
*Croman*, 2014 WL 7008431, at *4 (Del. Super. Ct. Nov. 25, 2014) ("In Delaware, liquidated
damages are presumptively valid and enforceable, unless the liquidated damages constitute a
penalty.")) "The distinction between a penalty and a liquidated damages clause is significant—if
a provision is considered a penalty, it is void as against public policy and recovery is limited to
actual damages." *Delaware Bay Surgical Servs*, 900 A.2d at 650; *see also S.H. Deliveries, Inc.*,
1997 WL 817883, at *2 ("[A] 'penalty' is a sum inserted into a contract that serves as a
punishment for default, rather than a measure of compensation for its breach.  In other words, it
is an agreement to pay a stipulated sum upon breach, irrespective of the damage sustained.");
*Rattigan v. Commodore Int'l Ltd.*, 739 F. Supp. 167, 169 (S.D.N.Y. 1990) ("If such a clause is
intended to operate as a means to compel performance, it will be deemed a penalty and will not
be enforced.").  "Use of the word 'penalty' or 'liquidated damages' in a contract is not
conclusive as to the character of the disputed provision." *Olsen v. T.A. Tyre Gen. Contractor,*
*Inc.*, 2006 WL 2661140, at *2 n.1 (Del. 2006).  The notion is that, while parties are permitted to
calculate in advance a sum that would reasonably compensate the non-breaching party for the
damages caused by the breach, the law of contracts prohibits penalizing a party from what
otherwise is not considered a wrongful or tortious act—the efficient breach of a contract.  *See*
*Unbound Partners Ltd. P'ship*, 251 A.3d at 1032 (defining a penalty clause as imposing
punishment for default).

"Where [1] the damages are uncertain and [2] the amount agreed upon is reasonable, such an agreement will not be disturbed." *Delaware Bay Surgical Servs., P.C.,* 900 A.2d at 651 (quoting *Brazen*, 695 A.2d at 48); *see also United Air Lines, Inc. v. Austin Travel Corp.*, 867 F.2d 737, 740 (2d Cir. 1989) (Under New York law, "[l]iquidated damages are not penalties if they bear a reasonable proportion to the probable loss and the amount of actual loss is incapable or difficult of precise estimation." (internal quotation marks omitted)); *LG Cap. Funding, LLC v. 5Barz Int'l, Inc.*, 307 F.Supp.3d 84, 101 (E.D.N.Y. 2018) (stating, under New York law, that "[i]f the provision "does not satisfy *one or both* of these factors, the liquidated damages provision will be deemed an unenforceable penalty." (emphasis added)).  To fail the second prong under Delaware law, the damages must be "*uncertain or incapable of accurate calculation*," and to fail the second prong, the damages must be "*unconscionable or not rationally related* to any measure of damages a party might conceivably sustain," *Delaware Bay Surgical Servs., P.C.*, 900 A.2d at 651 (quoting *Brazen*, 695 A.2d at 48) (emphasis in original). There are "two factors . . . relevant to a determination of whether the amount fixed as liquidated damages is reasonable." *Brazen*, 695 A.2d at 48.  "The first factor is the anticipated loss by either party should the merger not occur.  The second factor is the difficulty of calculating that loss: the greater the difficulty, the easier it is to show that the amount fixed was reasonable." *Id.* at 48.  As opposed to the "business judgment rule," in which "[c]ourts do not apply an objective reasonableness test . . . to examine the wisdom of the decision itself," "courts [under the liquidated damages rubric] will not substitute their business judgment for that of the directors, but will examine the decision to assure that it is, 'on balance, within a range of reasonableness.'" *Id.* at 49.

"Where, as provided for in a convertible note, a defendant fails to convert debt into shares and deliver them to the plaintiff, the calculation of expectation damages must include the principal and any accrued interest being converted. Courts can do this in one of two ways: (1) 'multiplying the number of shares owed by the mean market value of that stock on the day of the breach,' or (2) multiplying the number of shares owed by the difference between the market price and the conversion price . . . and then adding back the converted principal and any accrued interest." *LG Cap. Funding, LLC v. ExeLED Holdings Inc.*, 2021 WL 4949173, at *6 (S.D.N.Y. Oct. 25, 2021) (quoting *LG Cap. Funding, LLC v. CardioGenics Holdings, Inc.*, 787 F. App'x 2, 3 (2d Cir. 2019) (summary order)); *see also Boyce v. Soundview Tech. Grp., Inc.*, 464 F.3d 376, 385 (2d Cir. 2006) (valuation of a "publicly traded stock" for the purposes of damages utilizes "'the mean between the highest and lowest quoted selling prices,'" (quoting *United States v. Cartwright*, 411 U.S. 546, 551 (1973))).

The Court agrees with EMA that Section 3.20 is an enforceable liquidated damages clause but disagrees with EMA on its interpretation.  EMA's first error is in concluding that the provision entitles it to damages based on the application of a figure of double the sum of the principal, accrued interest, and Default Interest to the conversion rate.  A close reading of the relevant language demonstrates that it provides EMA no such entitlement.  The language of Section 3.20 is carefully phrased. The third Paragraph provides that

> [t]he Holder shall have the right at any time after the occurrence of an Event of Default, to require the Borrower, to immediately issue, *in lieu of the Default Amount and/or Default Sum, the number of shares of Common Stock of the Borrower equal to the Default Amount and/or Default Sum divided by the Conversion Price then in effect*, subject to issuance in tranches due to the beneficial ownership limitations provided in this Note.

Dkt. No. 12-2 § 3.20.  It thus refers specifically to the "Default Amount" and/or the "Default Sum." And Section 3.20 defines the Default Sum as "the then outstanding principal amount of

this Note to the date of payment plus the amounts referred to in clauses (x), (y) and (z)."  For reference, the relevant portion of Section 3.20 states that the payment shall be:

> an amount equal to . . . (i) 200% times the sum of (w) the then outstanding principal amount of this Note plus (x) accrued and unpaid interest on the unpaid principal amount of this Note to the date of payment (the "Mandatory Repayment Date") plus (y) Default Interest, if any, on the amounts referred to in clauses (w) and/or  (x) plus (z) any amounts owed to the Holder pursuant to Section and 1.4(g) hereof (*the then outstanding principal amount of this Note to the date of payment plus the amounts referred to in clauses (x), (y) and (z) shall collectively be known as the "Default Sum"*).

*Id.* (emphasis added).  The Note thus defines "Default Sum" as "the then outstanding principal amount of this Note to the date of payment" plus (x), (y), and (z).  *Id.*  It does not define the term Default Sum as including double the sum of those amounts.  The amounts referenced in clauses (x) and (y) (as clause (z) has been abandoned here, see *supra* note 12) also clearly refer to pre-doubling amounts of interest and Default Interest.  Subpart (i), which contains the language referencing double the principal amount refers to a sum *in cash* that the Note holder is entitled to upon an Event of Default.  It does not refer to a sum that the Note holder can then apply at the contractual conversion rate to yield a number of shares.  Thus, if EMA elects to receive damages based upon a calculation of shares it would be entitled to on conversion, it is entitled only to the number of shares that would be yielded by application of the pre-doubled principal, accrued interest, and Default Interest under Section 3.20 of the Note.

Section 1.1, the provision that establishes EMA's conversion right, further confirms this analysis.  Although that section appears to provide EMA with a relatively unfettered right to convert amounts owed under the Note to shares, it is limited by the remainder of the paragraph.  The beginning of Section 1.1. provides that EMA:

> shall have the right, in its sole and absolute discretion, at any time from time to time, to convert all or any part of the outstanding amount due under this Note (such outstanding amount includes but is not limited to the principal, interest and/or

Default Interest accrued, *plus any and all other amounts owed pursuant to the terms of this Note*) into fully paid and non-assessable shares of Common Stock.

Dkt. No. 12-2 § 1.1 (emphasis added).  Section 1.1, however, later provides the mechanism for executing this right.  In doing so, it states that the "Conversion Amount," along with the conversion price, defines the number of shares.

> The number of shares of Common Stock to be issued upon *each Conversion of this Note ("Conversion Shares") shall be determined by dividing the Conversion Amount (as defined below) by the applicable Conversion Price* then in effect on the date specified in the notice of conversion, in the form attached hereto as Exhibit A (the "Notice of Conversion"), delivered to the Borrower by the Holder in accordance with Section 1.4 below; provided that the Notice of Conversion is submitted by facsimile or e-mail (or by other means resulting in, or reasonably expected to result in, notice) to the Borrower or Borrower's transfer agent before 11:59 p.m., New York, New York time on such conversion date (the "Conversion Date"). *The term "Conversion Amount" means, with respect to any Conversion of this Note, the sum of (1) the principal amount of this Note to be converted in such Conversion, plus (2) accrued and unpaid interest, if any, to be converted in such Conversion at the interest rates provided in this Note to the Conversion Date, plus (3) at the Holder's option, Default Interest, if any, on the amounts referred to in the immediately preceding clauses (1) and/or (2), plus (4) any Additional Principal for such Conversion, plus (5) at the Holder's option, any amounts owed to the Holder pursuant to Sections 1.2(c) and 1.4(g) hereof.*

*Id*. (emphasis added).  Absent from this "Conversion Amount" is any mention of amounts owed under Section 3.20, even though specific mention is made of the liquidated damages clauses in Sections 1.2(c) and 1.4(g).  Reading Section 3.20 to entitle the Note holder to convert shares based on a figure of double the principal would place it in needless conflict with Section 1.1.  Moreover, to interpret the beginning of Section 1.1 so broadly—namely, that EMA may convert "any and all other amounts owed"—would essentially render both the specific categorization of amounts owed in the "Conversion Amount" provision in Section 1.1 and the specific application of third paragraph of Section 3.20 to conversion of the Default Sum to be superfluous.  There would be no purpose in specifying the categories of amounts owed subject to conversion in either provision if the beginning of Section 1.1 operates as an all-inclusive catch-all.  Delaware

law indicates that the Court ought not read contracts in this manner.  *See Honeywell Int'l, Inc. v. Air Prods. & Chems., Inc.*, 872 A.2d 944, 956 (Del. 2005) ("[A]bsent evidence calling for a different result, all parts of a contract must be read in harmony to determine the contract's meaning, with one portion of a contract not being read to negate a different portion."); *NAMA Holdings, LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 419 (Del. Ch. 2007), *aff'd*, 945 A.2d 594 (Del. 2008) ("Contractual interpretation operates under the assumption that the parties never include superfluous verbiage in their agreement."); *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010) ("An unreasonable interpretation produces an absurd result or one that no reasonable person would have accepted when entering the contract.").  The better interpretation of the third paragraph of Section 3.20, and the only one that makes sense of the Note as a whole, is that it addresses the holder's right to convert and the Conversion Price at which the holder is permitted to convert and not that it gives the Note holder upon default a right to convert based on a principal amount that is doubled the amount the Note holder is owed.

Under Section 3.20, EMA has the option of choosing to double the "Default Sum"—the leftover principal, accrued interest, and Default Interest.  It also has the option of choosing instead to convert the Default Sum into shares.  But EMA does *not* have the option of doubling the Default Sum and then converting it into shares under the terms of the Note.

Having construed the Note correctly, the Court finds that Section 3.20 is an enforceable liquidated damages clause.  Courts in the Second Circuit have differed in their assessments as to whether multiplier provisions similar to the one in this case—including in cases involving EMA—constitute an unenforceable penalty.  *See*, *e.g.*, *Parallax Health Scis., Inc. v. EMA Fin., LLC*, 2022 WL 2442338, at *10 (S.D.N.Y. June 13, 2022), *report and recommendation adopted*, 2022 WL 2354546 (S.D.N.Y. June 30, 2022) (finding 200% multiplier unenforceable as it

applied to the 24% Default Interest rate and otherwise would only serve as a "penalty"); *EMA Fin., LLC v. Joey New York Inc.*, 2022 WL 292920, at *15 (S.D.N.Y. Feb. 1, 2022) (finding 150% multiplier provision to be unenforceable because "actual damages are not hard to calculate" and the provision is "grossly disproportionate"); *LG Cap. Funding, LLC v. One World Holding, Inc.*, 2018 WL 3135848, at *13 (E.D.N.Y. June 27, 2018) (finding 200% damages provision to be enforceable because the conversion rate of the stock was 50% and thus enforcement of the provision was "essential in order to make Plaintiff whole").

As an initial matter, EMA challenges only the reasonableness of Section 3.20.  It does not argue that damages could be calculated with relative certainty.  In fact, EMA appears to argue the opposite, stating that "because the trading volume of AppTech shares is low, assuming EMA could convert such shares and quickly sell them at a premium operates outside of the established facts" and then arguing for further discovery on the issue.  Dkt. No. 25 at 15–16.  While it is possible for EMA to successfully challenge Section 3.20 as an unenforceable penalty under Delaware law by only challenging the reasonableness prong, *see Delaware Bay Surgical Servs., P.C.,* 900 A.2d at 651, the "difficulty of calculating th[e] loss" correlates with the reasonableness of the damages, *see Brazen*, 695 A.2d at 48.  AppTech's arguments that the trading volume is low, that price changes during sale would be volatile, and that more discovery is needed, all suggest that calculating loss would be difficult and thus undercut EMA's reasonableness challenge.

The Court thus grants summary judgment on the basis that Section 3.20[18] is not unreasonable because it is "rationally related" to the actual measure of damages and not

---

[18] Neither party contends that Section 3.20 is not a liquidated damages clause.  *See*, *e.g.*, Dkt. No. 39 at 2 n.2 (EMA referring to Section 3.20 as providing "liquidated damages").

unconscionable.[19]  With respect to whether the multiplier is "rationally related" to the actual

measure of damages, the Note provided that its conversion discount would be

> the lower of: (i) the lowest closing price of the Common Stock during the preceding twenty-five (25) Trading Day period ending on the latest complete Trading Day prior to the Issue Date of this Note or (ii) 75% of the *lowest trading price* for the Common Stock on the Principal Market during the twenty five (25) consecutive Trading Days including and immediately preceding the Conversion Date.

Dkt. No. 12-2 1.2(a) (emphasis added).  Therefore, had AppTech not defaulted on the Note,

EMA would have been able to convert the principal and interest owed to it for a discount of 75%

of the "lowest trading price"—not the average market price, or the highest market price.

Importantly, AppTech is akin to a "thinly traded penny stock," Dkt. No. 26 at 11; *see also* Dkt.

No. 25 at 15 (AppTech stating that its stock is "thinly traded"), which generally have the

tendency to "trad[e] intermittently and at widely fluctuating prices," *Almond for Almond Fam.*

*2001 Tr. v. Glenhill Advisors LLC*, 2018 WL 3954733, at *8 (Del. Ch. Aug. 17, 2018).  For

example, AppTech's VWAP after its June breach ranged from $1.3254 to $1.6348 during the

following month—a nearly 23% swing.  Dkt. No. 12-8.  Seeking liquidated damages of double

the principal and accumulated interest is thus "rationally related to [the] measure of damages a

party might conceivably sustain," *Unbound Partners Ltd. P'ship*, 251 A.3d at 1033, because

75% of the lowest trading price during the prior twenty-five days may end up being an even

lower percentage of the "mean market value of that stock on the day of the breach," *ExeLED*

*Holdings Inc.*, 2021 WL 4949173, at *6, or the price at which EMA could have theoretically

---

[19] Although Section 3.20 allows for application of the doubling multiplier to Default Interest, EMA did not seek to double the Default Interest (before erroneously converting the doubled sum to shares).  Because EMA has not sought summary judgment on the application of the doubling multiplier to Default Interest, the Court need not determine whether such an application would be an unenforceable penalty.  *Cf. Parallax Health Scis., Inc.*, 2022 WL 2442338, at *11 (S.D.N.Y. June 13, 2022) (concluding that doubling EMA's 24% Default Interest had "no justification").

immediately sold its shares.  In addition, Section 1.2(a) contemplates the alternative possibility of using "the lowest closing price of the Common Stock during the preceding twenty-five . . . Trading Day period . . . prior to the Issue Date of this Note."  Dkt. No. 12-2 § 1.2(a).  That also may have been at 50% of the average market price at the time of the breach, justifying the 200% multiplier.  *See S.E.C. v. Bronson*, 14 F. Supp. 3d 402, 404 (S.D.N.Y. 2014) ("[P]enny stocks are considered to be particularly high risk and not suitable to all investors.").  Thus, even if such liquidated damages ended up substantially more than the actual market price of shares, they still constituted a "reasonable estimate of the damages which *could* be caused."  *DecisivEdge, LLC v. VNU Grp., LLC*, 2018 WL 1448755, at *6 (Del. Super. Ct. Mar. 19, 2018) (emphasis added).

The specific terms of the Note and the context of penny stock trading make this case more comparable to *One World Holding, Inc*, in which a court in the Eastern District of New York concluded that use of a doubling multiplier was proper.  *One World Holding, Inc.* involved a provision in which there was a doubling multiplier applied to "outstanding principal and accrued interest, plus 'Default Interest.'"  *One World Holding, Inc.*, 2018 WL 3135848, at *1. Like the Note here when properly construed, the promissory note at issue there did not subsequently convert that doubled sum to shares.  *See LG Cap. Funding, LLC v. One World Holdings, Inc.*, No. 15-cv-0698 (E.D.N.Y. Aug. 6, 2015), Report and Recommendation, ECF No. 28 at 9.  The conversion ratio of the debt was at "50% of the Market Price," with the "Market Price" being the "average of the lowest three (3) Trading Prices for the Common Stock during the ten (10) Trading Day period ending one Trading Day prior to the date the Conversion Notice is sent."  *LG Capital Funding, LLC v. One World Holdings, Inc.*, No. 15-cv-0698, ECF. No. 5-1 at 2.  Although 75% is higher than 50%, the 75% conversion price here is taken from a singular lowest price, with no moderation through averaging, over a significantly longer time period that

provides greater opportunity for volatile fluctuation.  A doubling multiplier is thus also "rationally related" to "make [EMA] whole," *One World Holding, Inc.*, 2018 WL 3135848, at *14, given the potential uncertainty and volatility of prices here.

Nor is the 200% multiplier, when applied to the principal and accrued interest, unconscionable under Delaware law.  That the 75% of the lowest price during the preceding twenty-five days of the Conversion Date might not be equivalent to 50% of the market price at the time of breach does not render the doubling multiplier "unconscionable."  Delaware courts have held that liquidated damages of even greater proportion to actual damages are not unconscionable.  *See*, *e.g.*, *Symbiont.io, Inc. v. Ipreo Holdings, LLC*, 2021 WL 3575709, at *58 (Del. Ch. Aug. 13, 2021) (finding that liquidated damages of $70 million was not unconscionable relative to actual damages of $26 to $45 million).  The fact that the 200% multiplier bears a rational relationship to the nature of the sought-after asset—penny stocks, which are inherently high risk—further indicates that the multiplier is not unconscionable.  *Cf. Leasing Serv. Corp. v. Just.*, 673 F.2d 70, 74 (2d Cir. 1982) (finding under New York law that the value that was "incapable of precise estimation" and "may in fact fluctuate radically over time" supported finding that a lease provision was not unconscionable).

EMA's second error flows from its first error.  EMA mistakenly applies the Default Interest to the doubled sum from Section 3.20.  Because the doubled sum never constituted or replaced the principal or interest, EMA incorrectly applied its Default Rate.[20]  And because EMA

---

[20] AppTech also argues in an untimely Rule 56.1 Counterstatement that the Default Interest rate is inapplicable due to New York's usury laws. Dkt. No. 28 ¶¶ 34, 43. For reasons previously stated, the Court declines to consider AppTech's untimely Rule 56.1 Counterstatement. *See supra* note 2. And such legal argument is improperly raised in a Rule 56.1 Counterstatement. *See Risco v. McHugh*, 868 F. Supp. 2d 75, 88 n.2. (S.D.N.Y. 2012) (citing cases). But even if New York law—and not Delaware law—governed this dispute, the default interest is not usurious because it does not exceed 25%, the relevant usury rate for AppTech's usury defense.

is only allowed to convert the Default Sum *or* receive a doubled sum under Section 3.20, EMA also erred in assuming that it could apply the Default Interest once again on the final erroneously converted double payment. That Default Interest should only apply to the principal and accrued interest. It does not apply to any resulting figure *after* either conversion or doubling under Section 3.20.

## 2. Damages from Breach of the Warrant

With respect to the cashless exercise provision under Section 2(d) of the Warrant Agreement, EMA argues for summary judgment that it is entitled to a pre-interest damages figure of $427,999.39, reflecting the conversion of 287,692 shares at a price of $1.4877 per share. Although the failure of EMA to establish an entitlement to the requested damages with respect to the Note alone deprives EMA of any right to summary judgment with respect to damages in this case, the Court notes a discrepancy with respect to the calculation of the

---

*See Blue Citi, LLC v. 5Barz Int'l Inc.*, 338 F. Supp. 3d 326, 334 (S.D.N.Y. 2018), *aff'd*, 802 F. App'x 28 (2d Cir. 2020) (summary order) ("Under New York law, a contract is criminally usurious if the parties to the agreement knowingly provide for an interest rate of 25 percent per annum or more. See N.Y. Penal Law § 190.40."); *Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 326, 179 N.E.3d 612, 616 (2021) ("[T]he defense of usury is not available to corporations, but this bar does not preclude a corporate borrower from raising the defense of "criminal usury" (i.e., interest over 25%) in a civil action."); Dkt. No. 12-2 at 1 (defining the "Default Interest" as 24%). Alternatively, under Delaware law, *see supra* note 5 (concluding that Delaware law governs this dispute), the Default Rate is not usurious. *See* 6 Del. Code § 2301(c) ("[T]here shall be no limitation on the rate of interest which may be legally charged for the loan or use of money, where the amount of money loaned or used exceeds $100,000, and where repayment thereof is not secured by a mortgage against the principal residence of any borrower."). In addition, the imposition of default interest may serve a useful purpose in blocking obstructive action delaying recovery. *See* Gregory Klass, *Contracting for Cooperation in Recovery*, 117 Yale L.J. 2, 21 (2007) ("Compensation for the other secondary harms of obstructive breach—delay in recovery and inability to mitigate—is in all cases more effectively accomplished using prejudgment interest clauses . . . ."). The Court thus holds that Default Interest may be applied under a correctly construed Section 3.20 of the Note, in which Default Interest only applies to the principal and accrued interest, and not the doubled payment or converted Default Sum.

warrants that the parties should address in the further proceedings that will be required in this case.

Again, Section 2(d) addresses the number of shares EMA is entitled to under the Warrant and provides that:

> [T]he Holder shall be entitled to receive a certificate for the number of Warrant Shares equal to the quotient obtained by dividing [(A-B) (X)] by (B), where:
>
> (A) = the Market Price (as defined below);
>
> (B) = the Exercise Price of this Warrant (as adjusted); and
>
> (X) = the number of Warrant Shares issuable upon exercise of this Warrant in accordance with the terms of this Warrant by means of a cash exercise rather than a cashless exercise.

Dkt. No. 12-2 § 2(d).

EMA submitted its 2(d) calculation in a letter to the Court on September 8, 2022. That letter stated the following:

> The cashless exercise formula provided in 2(d) of the Warrant is the number of Warrant Shares issuable upon exercise of this Warrant in accordance with terms of this Warrant by means of a cash exercise rather a cashless exercise (480,000) multiplied by (the Market Price ($1.56) less the anti-dilution/base price (0.625) = 0.935)) *divided by the Market Price 1.56.* Accordingly, (480,000 x .935 = 448,800 / 1.56 = 287,692 common shares to be issued under cashless exercise.

Dkt. No. 39 at 2 (emphasis added). Thus, it appears that EMA derived the warrant figure by dividing the numerator by the Market Price or (A). But the contract on its face (and curiously[21]) requires the numerator to be divided by the Exercise Price or (B). Had EMA divided the numerator by the Exercise Price of the Warrant rather than by the Market Price, the resulting figure would have yielded 718,080 common shares. EMA does not appear to be alone in reflecting that the intended approach, contra the contract, is to use the Market Price (A).

---

[21] The formula is curious since a cashless exercise typically yields less shares than a cash exercise.

AppTech appears to agree.  Whether the numerator should be divided by Market Price (A) rather than Market Price (B), whether the stated formula is a product of mutual mistake, or whether the Court has misinterpreted the provision is a subject that will have to await further briefing.

### 3.    Attorneys' Fees

Finally, EMA moves for summary judgment for an award of costs and reasonable attorneys' fees under Section 4.5 of the Note, noting that it has incurred total fees and costs of $6,995.00 as of its filing of its motion for summary judgment.  Dkt. No. 14 at 12.  AppTech argues that an award of attorneys' fees is not warranted because the underlying Agreements are illegal.  Dkt. No. 25 at 1, 3, 13–14.  As previously noted, the Court has rejected that argument. *See supra* Section I.  While "[u]nder the American Rule and Delaware law, litigants are normally responsible for paying their own litigation costs, [i]n contract litigation, where the contract contains a fee-shifting provision, [Delaware courts] will enforce that provision."  *SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 352 (Del. 2013) (internal quotation marks omitted). Section 4.5 of the Note provides that "[i]f default is made in the payment of this Note, the Borrower shall pay the Holder hereof costs of collection, including reasonable attorneys' fees." Dkt. No. 12-2 § 4.5.  It also states in Section 4.6 that "[t]he prevailing party shall be entitled to recover from the other party its reasonable attorney's fees and costs."  Dkt. No. 12-2 § 4.6.  The Court grants summary judgment in favor of EMA on this issue and concludes EMA is entitled to attorneys' fees and costs but reserves decision on the specific figure and the reasonableness of that figure pending final resolution of the damages award.

### CONCLUSION

The motion for summary judgment is GRANTED IN PART and DENIED IN PART. The motion to dismiss is DENIED.

The Clerk of Court is respectfully directed to close Dkt. Nos. 11 and 17.


SO ORDERED.


Dated: September 13, 2022
      New York, New York

                                   LEWIS J. LIMAN
                             United States District Judge