```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                                  :
EMA FINANCIAL, LLC, a Delaware Limited Liability                  :
Company,                                                          :
                                            Plaintiff,            :
                                                                  :        21-cv-6049 (LJL)
                -v-                                               :
                                                                  :        OPINION AND ORDER
APPTECH CORP., a Wyoming Corporation,                             :
                                                                  :
                                            Defendant.            :
                                                                  :
------------------------------------------------------------------X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/01/2022

LEWIS J. LIMAN, United States District Judge:

Pursuant to an Order from this Court, Dkt. No. 43, the parties submitted supplemental briefing addressed to the issue of damages arising from two securities contracts that the Court determined, on summary judgment, that AppTech Corp. ("AppTech" or "Defendant") breached.

## BACKGROUND

The Court assumes familiarity with the background of this case, which was set forth in this Court's Opinion and Order dated September 13, 2022, granting in part and denying in part Plaintiff's motion for summary judgment and denying the Defendant's motion to dismiss. Dkt. No. 40 ("September 13 Opinion and Order").

In brief, on or about November 18, 2020, AppTech, a small public corporation, entered into a Securities Purchase Agreement and two related securities contracts with EMA Financial, LLC ("EMA" or "Plaintiff"), an investment firm. Those contracts were (1) a note issued to EMA for $300,000 in convertible debt (the "Note") and (2) a Common Stock Purchase Warrant (the "Warrant") providing EMA the option to purchase up to 200,000 Warrant Shares in AppTech stock. Dkt. No. 28 ¶¶ 1–2. The Note allowed EMA to submit a "Notice of Conversion" to convert amounts due under the Note into shares of AppTech common stock. *Id*.

¶¶ 3, 9. Once EMA submitted a Notice of Conversion, AppTech was obligated to issue and deliver certificates for common stock within one business day after receipt of the Notice of Conversion. *Id*. ¶ 6. The Warrant allowed EMA to likewise submit a "Notice of Exercise" that obligated AppTech to deliver those shares within three trading days of receipt of the Notice of Exercise. *Id*. ¶¶ 9–11.

On July 13, 2021, EMA submitted two Notices of Conversion to convert debt into 990,791 common shares and 491,262 common shares.[1] That same day, EMA also submitted a Notice of Exercise seeking to exercise the right to purchase 480,000 warrant shares of stock via cashless exercise, which purportedly translated into 287,693 common shares. *Id*. ¶¶ 14–16. AppTech did not honor the Notices of Conversion and the Notice of Exercise. *Id.* ¶ 17. Those events, along with other breaches by AppTech of the agreements that are irrelevant here, constituted "Events of Default" under the Note. *Id*. ¶¶ 23–25, 27.

With respect to damages from breach of the Note, Section 3.20 of the Note describes payments in the case of an event of default. That section states the following:

> Upon the occurrence of any Event of Default specified in Article III of the Note, the Note shall become immediately and automatically due and payable without demand, presentment or notice and the Borrower shall pay to the Holder, in full satisfaction of its obligations hereunder, an amount equal to the greater of *(i) 200% times the sum of (w) the then outstanding principal amount of this Note plus (x) accrued and unpaid interest on the unpaid principal amount of this Note to the date of payment (the "Mandatory Repayment Date") plus (y) Default Interest, if any, on the amounts referred to in clauses (w) and/or (x) plus (z) any amounts owed to the Holder pursuant to Section and 1.4(g) hereof (the then outstanding principal amount of this Note to the date of payment plus the amounts referred to in clauses (x), (y) and (z) shall collectively be known as the "Default Sum")* or (ii) the "parity value" of the Default Sum to be prepaid, where parity value means (a) the highest number of shares of Common Stock issuable upon conversion of or otherwise pursuant to such Default Sum in accordance with Article I, treating the Trading Day

---

[1] EMA also submitted a Notice of Conversion on June 14, 2021 seeking to convert a portion of the Note into 75,000 shares that AppTech failed to honor. *See* Dkt. No. 12-7. That notice was later replaced by the Notices of Conversion on July 13, 2021. Dkt. No. 12 ¶ 15 n.1.

2

immediately preceding the Mandatory Repayment Date as the "Conversion Date" for purposes of determining the lowest applicable Conversion Price, unless the Default Event arises as a result of a breach in respect of a specific Conversion Date in which case such Conversion Date shall be the Conversion Date), multiplied by (b) the highest closing price for the Common Stock during the period beginning on the date of first occurrence of the Event of Default and ending one day prior to the Mandatory Repayment Date (the "Default Amount") and all other amounts payable hereunder shall immediately become due and payable, all without demand, presentment or notice, all of which hereby are expressly waived, together with all costs, including, without limitation, legal fees and expenses, of collection, and the Holder shall be entitled to exercise all other rights and remedies available at law or in equity. If at any time while this Note is outstanding the Borrower's Common Stock trades below $0.01, the principal amount of the Note shall automatically and without further action increase by twenty-five thousand dollars ($25,000).

*The Holder shall have the right at any time after the occurrence of an Event of Default, to require the Borrower, to immediately issue, in lieu of the Default Amount and/or Default Sum, the number of shares of Common Stock of the Borrower equal to the Default Amount and/or Default Sum divided by the Conversion Price then in effect*, subject to issuance in tranches due to the beneficial ownership limitations provided in this Note.

Dkt. No. 12-2 § 3.20 (relevant portions emphasized). Section 3.20 thus provides that EMA may elect for conversion to shares of a "Default Sum," which is constituted by the (w) "outstanding principal amount," (x) "accrued and unpaid interest on the unpaid principal," and (y) Default Interest, if any, on (w) and (x). Alternatively, Section 3.20 allows for the doubling of that "Default Sum." In the September 13 Opinion and Order, the Court determined that EMA was not entitled to both options, in which it could convert a doubled Default Sum to shares. Dkt. No. 40 at 33.

As for damages from breach of the Warrant, Section 2(d) of the Warrant provides the following formula for when EMA seeks to exercise its rights in the Warrant via the mechanism of cashless exercise:

[T]he Holder shall be entitled to receive a certificate for the number of Warrant Shares equal to the quotient obtained by dividing [(A-B) (X)] by (B), where:

(A) = the Market Price (as defined below);

3

> (B) = the Exercise Price of this Warrant (as adjusted); and
>
> (X) = the number of Warrant Shares issuable upon exercise of this Warrant in accordance with the terms of this Warrant by means of a cash exercise rather than a cashless exercise.
>
> "Market Price" shall mean the closing sale price per share of Common Stock on the principal market where the Common Stock is traded on the Trading Day immediately preceding delivery of the Notice of Exercise or the Closing Date, whichever is greater.

Dkt. No. 12-3 § 2(d). In the September 13 Opinion and Order, the Court noted that both parties appeared to utilize (A) (the Market Price) as the denominator, rather than the contractually required (B) (the Exercise Price) and noted that it would seek additional briefing on the issue. Dkt. No. 40 at 39.

Finally, of relevance here, Section 3(b) the Warrant also describes how a "Dilutive Issuance" may occur which may increase the overall Warrant Shares allocated to EMA. That section provides the following:

> Subsequent Equity Sales. If the Company or any Subsidiary thereof, as applicable, at any time while this Warrant is outstanding, shall sell or grant any option to purchase, or sell or grant any right to reprice, or *otherwise dispose of or issue ( or announce any offer, sale, grant or any option to purchase or other disposition) any Common Stock or securities entitling any Person, except employees or contractors for services, to acquire shares of Common Stock (upon conversion, exercise or otherwise)* at an effective price per share less than the then Exercise Price (such lower price, the "Base Share Price" and *such issuances collectively, a "Dilutive Issuance"*) (if the holder of the Common Stock or Common Stock Equivalents so issued shall at any time, whether by operation of purchase price adjustments, reset provisions, floating conversion, exercise or exchange prices or otherwise, or due to warrants, options or rights per share which are issued in connection with such issuance, be entitled to receive shares of Common Stock at an effective price per share which is less than the Exercise Price, such issuance shall be deemed to have occurred for less than the Exercise Price on such date of the Dilutive Issuance), *then the Exercise Price shall be reduced and only reduced to equal the Base Share Price, and the number of Warrant Shares issuable hereunder shall be increased such that the aggregate Exercise Price payable hereunder, after taking into account the decrease in the Exercise Price, shall be equal to the aggregate Exercise Price prior to such adjustment*. Such adjustment shall be made whenever such Common Stock or Common Stock Equivalents are issued. The Company shall notify the Holder in writing, no later than the Trading Day following the issuance of any Common Stock

4

>or Common Stock Equivalents subject to this Section 3(b), indicating therein the applicable issuance price, or applicable reset price, exchange price, conversion price and other pricing terms (such notice the "Dilutive Issuance Notice"). For purposes of clarification, whether or not the Company provides a Dilutive Issuance Notice pursuant to this Section 3(b), upon the occurrence of any Dilutive Issuance, after the date of such Dilutive Issuance the Holder is entitled to receive a number of Warrant Shares based upon the Base Share Price regardless of whether the Holder accurately refers to the Base Share Price in the Notice of Exercise.

Dkt. No. 12-3 § 3(b) (emphasis added). As described in the September 13 Opinion and Order, EMA exercised Notices of Conversion on March 28 and June 8 under the Note at a conversion price of $.625 per share. *See* Dkt. No. 40 at 24 (citing Dkt. No. 39-5 at 2; Dkt. No. 24 ¶¶ 5–6). AppTech issued shares of common stock to satisfy those Notices of Conversion. *Id*. Under Section 3(b) of the Warrant, that issuance of shares at that price effectively reduced the Exercise Price of the Warrant from $1.50 to $.625 and thus increased the number of Warrant Shares issuable to 480,000 shares in order to maintain the overall value of the Warrant at $300,000. *Id*. at 25.

## PROCEDURAL HISTORY

EMA filed its complaint against AppTech on July 14, 2021. Dkt. No. 1. EMA filed its motion for summary judgment on September 3, 2021. Dkt. No. 11. AppTech filed its motion to dismiss on September 9, 2021. Dkt. No. 17. Both parties submitted memoranda of law opposing the others' motions on October 15, 2021, Dkt. Nos. 22–25, and then submitted replies in support of their motions on October 25, 2021, Dkt. Nos. 26–27. AppTech submitted an untimely counterstatement to EMA's Rule 56.1 Statement on October 29, 2021. Dkt. No. 28. The Court heard oral argument on September 6, 2022. Dkt. No. 37. Following oral argument, both parties submitted letters to the Court providing answers to questions raised during oral argument. Dkt. Nos. 38, 39.

The Court then issued the September 13 Opinion and Order granting in part and denying in part the EMA's motion for summary judgment and denying AppTech's motion to dismiss. Dkt. No. 40.  The Court rejected AppTech's argument that the agreements were illegal and unenforceable because they required EMA to engage in acts it was prohibited from conducting in the absence of registration as a broker dealer.  *Id*. at 13–14.  Accordingly, the Court granted summary judgment to EMA on liability on the otherwise undisputed grounds that AppTech had breached its agreements with EMA.  *Id*. at 10.  The Court did not award summary judgment on damages.  *Id*. at 19.

The Court then issued an order for the parties to provide supplementary briefing on the choice of damages from breach of the Note and the formula of the cashless exercise of the Warrant.  Dkt. No. 43 ("October 12 Order").  On October 29, 2022, EMA filed its supplemental brief.  Dkt. No. 44.  On November 9, 2022, AppTech filed its opposition.  Dkt. No. 45.  On November 21, 2022, EMA filed its reply.  Dkt. No. 46.

## DISCUSSION

The Court first addresses the Note and then addresses the Warrant.  For the reasons that follow, based on the undisputed facts, Plaintiff is entitled to (1) damages for Defendant's breach of the Note of $599,870.68 plus prejudgment interest accruing at a rate of 24% per annum on a principal amount of $299,935.34 between June 14, 2021 and the date that final judgment is entered and (2) damages for breach of the Warrant of $427,999.39 plus additional interest at the Delaware statutory interest rate of 5% plus the Federal Reserve Discount Rate, to be adjusted as the Federal Reserve Discount Rate adjusts, between July 15, 2021 and the date that final judgment is entered.

I.      **Damages from Breach of the Note**

The October 12 Order sought supplemental briefing from the parties on the question of "[w]hether Plaintiff seeks to double the 'Default Sum' or convert the Default Sum into shares under Section 3.20 of the Note." Dkt. No. 43. In its supplemental briefing, EMA opted to "double the Default Sum rather than convert the Default Sum into shares." Dkt. No. 44 at 1. The parties agree on the amount of principal due under the Note, mostly agree on the amount of ordinary interest accrued on unpaid principal under the Note, and disagree on the application of Default Interest. The Court first explains the equation for damages provided for in the case of an Event of Default under the Note before addressing each component in detail. The Court concludes that, on the undisputed facts, Plaintiff is entitled to damages as a result of Defendant's breach of the Note of $599,870.68 plus prejudgment interest accruing at a rate of 24% per annum on a principal amount of $299,935.34 between June 14, 2021 and the date that final judgment is entered.

Section 3.20 of the Note outlines the amount that AppTech owed EMA upon an "Event of Default" as specified in the Note. That Section states, in part, the following:

> Upon the occurrence of any Event of Default specified in Article III of the Note, the Note shall become immediately and automatically due and payable without demand, presentment or notice and the Borrower shall pay to the Holder, in full satisfaction of its obligations hereunder, an amount equal to the greater of *(i) 200% times the sum of (w) the then outstanding principal amount of this Note plus (x) accrued and unpaid interest on the unpaid principal amount of this Note to the date of payment (the "Mandatory Repayment Date") plus (y) Default Interest, if any, on the amounts referred to in clauses (w) and/or (x) plus (z) any amounts owed to the Holder pursuant to Section and 1.4(g) hereof (the then outstanding principal amount of this Note to the date of payment plus the amounts referred to in clauses (x), (y) and (z) shall collectively be known as the "Default Sum")* or (ii) the "parity value" of the Default Sum to be prepaid, where parity value means (a) the highest number of shares of Common Stock issuable upon conversion of or otherwise pursuant to such Default Sum in accordance with Article I, treating the Trading Day immediately preceding the Mandatory Repayment Date as the "Conversion Date" for purposes of determining the lowest applicable Conversion Price, unless the Default Event arises as a result of a breach in respect of a specific Conversion Date

7

>in which case such Conversion Date shall be the Conversion Date), multiplied by (b) the highest closing price for the Common Stock during the period beginning on the date of first occurrence of the Event of Default and ending one day prior to the Mandatory Repayment Date (the "Default Amount") and all other amounts payable hereunder shall immediately become due and payable, all without demand, presentment or notice, all of which hereby are expressly waived, together with all costs, including, without limitation, legal fees and expenses, of collection, and the Holder shall be entitled to exercise all other rights and remedies available at law or in equity.  If at any time while this Note is outstanding the Borrower's Common Stock trades below $0.01, the principal amount of the Note shall automatically and without further action increase by twenty-five thousand dollars ($25,000).

Dkt. No. 12-2 § 3.20 (emphasis added).  Subsection (i) of Section 3.20, in short, provides the damages calculation as double the sum of the "(w) outstanding principal amount," "(x) accrued and unpaid interest on the unpaid principal . . . to the date of payment," and "(y) Default Interest" that has accumulated on the (w) outstanding principal amount and (x) accrued and unpaid interest.  The "(z) any amounts owed to the Holder pursuant to Section and 1.4(g) hereof" is not implicated in this dispute.  Subsection (ii), which describes an alternative "parity value" of the Default Sum, is not directly relevant to this dispute.

As for "(w) outstanding principal amount," it is undisputed that the amount due is $279,500.  *See* Dkt. No. 44 at 1 (EMA); Dkt. No. 45 at 4 (AppTech).  The doubled amount of the outstanding principal thus is $559,000.

As for "(x) accrued and unpaid interest on the unpaid principal . . . to the date of payment," the parties agree that the amount due is in the range of $20,400.  AppTech calculates this amount at $20,421.04 in total.  Dkt. No. 45 at 5.  EMA calculates this amount to be $20,435.34.  Dkt. No. 46 at 2.  EMA attributes this very minor difference of $14.30 to "[AppTech] . . . hav[ing] used the actual conversion dates and EMA us[ing] the Transfer Agent's approval dates." *Id*.  EMA refers to the "TA Confirm Date" column in their spreadsheet to account for the difference and to clarify the date at which it assumes that the principal owed is reduced by conversion to shares.  Dkt. No. 44-1.  Although the contract does not appear to address this directly, the Court

concludes that the date that the Transfer Agent approved the issuance of shares operates as the date of the reduction of principal under the Note. Absent approval of the Transfer Agent, no transfer of shares occurs. Throughout the Note, the parties agreed on provisions that underscore the significance of the Transfer Agent in effectuating the conversion. *See*, *e.g.*, Dkt. No. 12-2 § 2.7 (describing how AppTech may not change its Transfer Agent without prior written consent of EMA); § 3.2 (describing the role of the Transfer Agent in issuing shares); § 3.15 (requiring AppTech to provide certain instructions to any replacement transfer agent). The principal balance would not have been reduced if the Transfer Agent failed to approve the conversion and issue shares. Neither party contends AppTech can refuse to provide shares in response to a notice of conversion but still benefit from a reduced principal on its loan. EMA's calculation of $20,435.34 is thus correct. The doubled amount of the accrued and unpaid interest on the unpaid principal is $40,870.68.

As for "(y) Default Interest," the parties generally agree with AppTech's proposed use of the Default Interest rate. The Court concluded in its September 13 Opinion and Order "that Default Interest may be applied under a correctly construed Section 3.20 of the Note, in which Default Interest only applies to the principal and accrued interest, and not the doubled payment or converted Default Sum." Dkt. No. 40 at 37 n.7. The parties, however, offer a variety of positions on the proper application, if any, of a statutory prejudgment interest rate. *See* Dkt. No. 45 at 5 (AppTech); Dkt. No. 46 (EMA). But the Default Interest rate constitutes a prejudgment default interest rate that replaces the statutory rate of legal interest. *See Parallax Health Scis., Inc. v. EMA Fin., LLC*, 2022 WL 2442338, at *13 (S.D.N.Y. June 13, 2022), *report and recommendation adopted*, 2022 WL 2354546 (S.D.N.Y. June 30, 2022); *see also Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 620 (Del. Ch.), *aff'd sub nom. ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d

9

749 (Del. 2010) ("Delaware courts award prejudgment interest as a matter of right. Such interest is to be awarded from the date payment is due. *In the absence of an express contract rate*, Delaware courts use the 'legal rate' as a default rate." (emphasis added)); *Bridev One, LLC v. Regency Centers, L.P.*, 2017 WL 3189230, at *5 (Del. Super. Ct. July 20, 2017) ("Pre-judgment interest is awarded as a matter of right, an express contract rate of interest will be set as the default rate."); *see also* Dkt. No. 40 at 37 n.20 (describing how under Delaware Law, there is no limitation on the rate of interest as long as "the money loaned . . . exceeds $100,000" and "repayment is not secured by a mortgage against the principal residence of any borrower" (citing 6 Del. Code § 2301(c))). The Court thus rejects the various calculations submitted by the parties—fluctuating, compounding, or otherwise—that seek to apply a statutory interest rate to the principal and accrued ordinary interest. *See*, *e.g.*, Dkt. No. 44 at 1 (EMA submitting an "alternative calculation of prejudgment interest" pursuant to Delaware code but not incorporating the Default Interest rate); Dkt. No. 45 at 19–20 (AppTech arguing that the "[a]ctual damage" should include the Delaware statutory rate plus the regular interest rate and arguing that the Delaware statutory rate is a "replacement rate of the contractually agreed damages provision").[2] The parties have expressly agreed upon a pre-judgment interest rate through the Default Interest rate provision in the Note.

The Court also rejects EMA's contention that the Court should apply the "ordinary Note rate following the doubling." Dkt. No. 44 at 1. That calculation finds no support in the language

---

[2] The Court rejects AppTech's contention that the "recovery under the Convertible Note is so enormous . . . that there is no injustice by not adding any pre-judgment interest on the actual damages under the Warrant." Dkt. No. 45 at 20. The breaches of the two agreements constitute separate categories of damages. And under Delaware law, "prejudgment interest is awarded as a matter of right. Such interest is to be computed from the date payment is due." *Citadel Holding Corp. v. Roven*, 603 A.2d 818, 826 (Del. 1992) (citation omitted).

10

of the Note. The September 13 Opinion and Order concluded that the "doubled sum never constituted or replaced the principal or interest." Dkt. No. 40 at 37. The Court thus rejected EMA's calculation in which the Default Interest rate accrued on the doubled sum. *Id*. That same reasoning bars the application of the ordinary Note rate to the doubled sum. Nowhere does the contract indicate that the ordinary Note rate of 12% would apply to the doubled Default Sum.

AppTech offers a range of untimely arguments in its opposition letter which are outside the scope of the supplemental briefing ordered by the Court. These include the following: (i) the use of the term "and/or" allows this Court to apply the Default Interest rate to only the unpaid principal, and not to the accrued and unpaid interest, *see* Dkt. No. 45 at 5, and (ii) the conversion discount results in an effectively usurious interest rate under New York law, *see* Dkt. No. 45 at 16–17. Neither argument is proper at this stage and thus neither will be entertained. Both arguments could have been raised in AppTech's opposition to summary judgment.

AppTech's usury argument is untimely. "Usury is an affirmative defense." *Adar Bays, LLC v. Aim Expl., Inc.*, 285 F. Supp. 3d 698, 701 (S.D.N.Y. 2018). "The general rule in federal courts is that a failure to plead an affirmative defense results in a waiver." *Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1580 (2d Cir. 1994); *see also* F.R.C.P 8(c) (providing general rules for pleading affirmative defenses); 47 C.J.S. Interest & Usury § 342 ("An affirmative defense of usury generally must be pleaded, or it is usually waived.").

AppTech never filed an answer, let alone one asserting the affirmative defense of usury in this case. It also made no mention of usury in its motion to dismiss. It did not ask that the complaint be dismissed on grounds that the agreements were usurious. Nor did it mention it in its summary judgment opposition brief. It did not argue that summary judgment should be denied on grounds that the agreements were usurious. The first time AppTech mentioned usury

was in its untimely Rule 56.1 Counterstatement and then only in an offhand and legally incorrect way to state that the Default Interest rate was usurious under New York law.  Dkt. No. 28 ¶¶ 34, 43.  It made no mention of the argument it makes now that the conversion discount results in a usurious rate.  *See* Dkt. No. 45 at 17.  The Court held that the Rule 56.1 Counterstatement was untimely and refused to consider it.  Dkt. No. 40 at 2 n.2.  The September 13 Opinion and Order also rejected Defendant's reference to usury principally because "such legal argument is improperly raised in a Rule 56.1 Counterstatement."  Dkt. No. 40 at 37 n.20 (citing *Risco v. McHugh*, 868 F. Supp. 2d 75, 88 n.2. (S.D.N.Y. 2012)).[3]  Had AppTech properly raised a usury defense to the motion for summary judgment, the Court would have been prepared to address it.  *See Fleetwood Servs., LLC v. Ram Cap. Funding, LLC*, 2022 WL 1997207, at *14–18 (S.D.N.Y. June 6, 2022); *see generally Adar Bays. LLC v GeneSYS ID. Inc.*, 179 N.E.3d 612 (N.Y. 2021).  However, it was not properly raised and supplemental briefing after summary judgment briefing does not give AppTech a second bite at the apple.  *See*, *e.g.*, *Grande v. Hartford Bd. of Educ.*, 2021 WL 231134, *11 n.10 (D. Conn. 2021) ("The Court declines to consider arguments that were not advanced in the Plaintiff's opposition to the motion for summary judgment or at oral argument and which were outside the scope of the supplemental briefing ordered by the Court."); *see also Sharp v. Ally Fin., Inc.*, 328 F. Supp. 3d 81, 105 (W.D.N.Y. 2018) ("It is well-established in this Circuit that new arguments raised in successive briefing papers will not be considered where those arguments could have been raised in a previous submission.") (collecting cases).[4]

---

[3] The Court also stated that Delaware law applied.  Dkt. No. 40 at 8 n.5.  Defendant's argument raises the question whether that conclusion was in error.  The Court takes no position on the law that would be applicable to a usury defense in this case.

[4] AppTech's arguments concerning the punitive nature of the Note, *see generally* Dkt. No. 45 at 18–19, is governed by the law of the case, which "counsels a court against revisiting its prior

12

AppTech's argument regarding the term "and/or" in Section 3.20 of the Note fails on its merits. The best reading of the "and/or" in that provision is that if there is outstanding principal, then Default Interest applies, and if there is outstanding unpaid accrued interest, then Default Interest applies, and if there is both principal and accrued interest, then Default Interest applies to both. AppTech argues that the term instead allows the Court to exercise "discretion" to apply the Default Interest rate to only the principal instead of both principal and accrued interest, and that it would be more "equitable" to apply the Default Interest rate only to the outstanding principal. Dkt. No. 45 at 5. But contracts are interpreted to reflect the reasonable expectations of the parties at the time of contracting, not to confer "equity" on the Court to reach a particular result after the fact. AppTech cites nothing to support its argument and offers no factual support for its claim that "[i]t is a common market practice that the default rate replaces the regular rate when the borrower defaults and applies to the principle [sic] as the new interest rate until the outstanding balance is paid off." *Id*.

Finally, under Section 3.20 of the Note, the Court only doubles the "(w) outstanding principal amount," and "(x) accrued and unpaid interest on the unpaid principal . . . to the date of payment." With respect to doubling the Default Interest rate, AppTech argues that such doubling of that Default Interest rate is punitive. Dkt. No. 45 at 19. In the September 13 Opinion and

---

rulings in subsequent stages of the same case absent cogent and compelling reasons such as an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Jackson v. New York* State, 523 F. App'x. 67, 69 (2d Cir.2013) (summary order). This Court has already rejected those arguments and—contrary to AppTech's contention—addressed both prongs of the inquiry for determining whether a liquidated damages clause is an unenforceable penalty. *See* Dkt. No. 40 at 34–38. Nothing in AppTech's opposition brief addresses the Court's analysis in the September 13 Opinion and Order, let alone introduces intervening law or new evidence. Additional arguments raised regarding punitiveness—aside from application of the doubling multiplier—were also waived by AppTech's failure to include them in any prior briefing.

13

Order, the Court noted that EMA did not argue that the Default Interest rate should be doubled, *see* Dkt. No. 40 at 35 n.19—an argument that has been rejected by at least one other court in this District. *See Parallax Health Scis., Inc.*, 2022 WL 2442338, at *13. Having not requested that the contractual prejudgment interest rate be doubled, nor having argued for it in supplementary briefing, EMA has waived the argument and does not receive the benefit of a doubled Default Interest rate.[5]

In summary, the damages due to breach of the Note are as follows: (1) double the outstanding principal amount, which is $559,000 total (200% of $279,500); (2) double the accrued and unpaid ordinary interest, which is $40,870.68 total (200% of $20,435.34); (3) undoubled Default Interest which began accruing on the "outstanding principal amount" and the "accrued and unpaid ordinary interest" on June 14, 2021. In other words, the damages are $599,870.68 plus prejudgment interest accruing at a rate of 24% on a principal amount of $299,935.34.

## II.     Damages from Breach of the Warrant

In its October 12 Order, the Court ordered the parties to provide supplemental briefing on the question of "[w]hether the warrant figure should be divided by the Market Price (A) or the Exercise Price (B) (or if the Court has otherwise misinterpreted the terms of the Warrant)." Dkt. No. 43. As to this question, both parties generally agree that the Market Price may be used for the calculation of the Warrant, although EMA offers a calculation with the Exercise Price as well. Citing *NFusz*, EMA explains that it "preemptively used the Market Price in its calculations in the summary judgment motion in light of certain decisions in this district." Dkt. No. 46 at 3.

---

[5] Although the Court concluded in its September 13 Opinion and Order that Delaware law governs this dispute, the fact that the Default Interest rate is not doubled also prevents it from likely being usurious under New York law. *See* Dkt. No. 40 at 37 n.20 (citing N.Y. Penal Law § 190.40 to describe how the New York limit on criminal usury is 25%).

14

AppTech similarly contends that the Warrant should be reformed to use the Market Price, rather than the Exercise Price. Dkt. No. 45 at 8. Given the parties' mutual agreement that the use of the Market Price is proper, and that EMA sought summary judgment using only the Market Price, the Court will not award EMA more than it requested. It will award damages utilizing the Market Price.

Section 2(d) of the Warrant provides the following formula for when EMA seeks to exercise its rights in the Warrant via the mechanism of cashless exercise:

> [T]he Holder shall be entitled to receive a certificate for the number of Warrant Shares equal to the quotient obtained by dividing [(A-B) (X)] by (B), where:
>
> (A) = the Market Price (as defined below);
>
> (B) = the Exercise Price of this Warrant (as adjusted); and
>
> (X) = the number of Warrant Shares issuable upon exercise of this Warrant in accordance with the terms of this Warrant by means of a cash exercise rather than a cashless exercise.
>
> "Market Price" shall mean the closing sale price per share of Common Stock on the principal market where the Common Stock is traded on the Trading Day immediately preceding delivery of the Notice of Exercise or the Closing Date, whichever is greater.

Dkt. No. 12-3 § 2(d). The Exercise Price was previously $1.50 per share. *Id*. § 2(c). However, the effect of the issuance of stock to satisfy the conversion at $.625 reset the warrant amount to 480,000 shares. Dkt. No. 40 at 25. Although the formula appears to require dividing by the "Exercise Price," the parties on summary judgment both assumed that the formula should be divided by the "Market Price." *See id.* at 24–26.

As noted by EMA, another court in the Southern District of New York has reformed one of EMA's warrant agreements to fix this oddity. *See NFusz*, 444 F. Supp. 3d at 530 ("Accordingly, the Warrant Agreement is reformed to reflect the only logical and appropriate reading of the cashless exercise formula therein."). Neither party disputes that the Market Price,

15

rather than the Exercise Price, should be used in the denominator of the cashless exercise provision. EMA states that "EMA used the Market Price in its initial calculation . . . due to certain decisions in this District such as . . . *NFusz* . . . , which held that the Market Price should be used in the context of the cashless exercise, rather than the specified Exercise Price." Dkt. No. 44 at 2. EMA does not appear to argue that *NFusz* was incorrectly decided. EMA, in its reply brief, reiterates that it "preemptively used" the Market Price and further "respond[s] to Defendant's damages arguments in this letter. . . [with] figures . . . based upon [the] Market Price." Dkt. No. 46 at 3. EMA does not request that the Court award damages under the Warrant using the Exercise Price. AppTech similarly argues that the denominator should be the Market Price, rather than the Exercise Price, contending that the formula "contains a clear and mutual error." Dkt. No. 45 at 7. Because neither party disagrees on the use of the Market Price, and because EMA only sought relief in the form of damages based on the Market Price on summary judgment, the Court will use the Market Price in the denominator to calculate damages under the Warrant.

AppTech also raises several new arguments in its opposition letter as to the Warrant. These include arguing that EMA's Notice of Conversion is not a "Dilutive Issuance" under the terms of the Warrant, *see id.* at 9–12, and relatedly, that EMA suffered no damages under the Warrant, *see id.* at 11–13. As a preliminary matter, these arguments are untimely and clearly outside the scope of the October 12 Order. AppTech could have raised these arguments in its opposition to summary judgment but did not do so. Accordingly, they are not properly raised now. *See supra* at pp. 9–10 (citing cases).

Regardless, AppTech's belated attempt to argue that a Dilutive Issuance had not occurred fails on the merits. AppTech argues that the Dilutive Issuance does "NOT include an event

16

when an existing holder of a convertible note exercises his conversion right and receives shares in exchange." Dkt. No. 45 at 10.  In particular, it argues that "converting convertible notes to shares to existing lenders constitutes business as usual, reflects parts of the capital structure that is already priced into the unit of the warrant and note, does not change the number of outstanding shares of the company, and consequently does not trigger any anti-dilution adjustments." *Id*.  But these contentions cannot find support in the text of Section 3(b).  That Section states that if AppTech "otherwise dispose[s] of or issue[s] . . . any Common Stock . . . at an effective price per share less than the Exercise Price . . . then the Exercise Price shall be reduced and only reduced . . . ." Dkt. No. 12-3 § 3(b).  There are no exceptions in Section 3(b) for existing holders of a convertible note.  AppTech also offers no support for its argument as to why issuance of shares from the conversion of debt could not ever be "dilutive" of equity—a proposition that flies in the face of general understandings of convertible debt.  The plain meaning of Section 3(b) forecloses AppTech's argument.

Finally, AppTech contends that EMA suffered no damages under the Warrant.  This argument assumes that the Exercise Price remains at $1.50, rather than the $.625 following the Dilutive Issuance.  For that reason alone, AppTech's statement that "[t]his Market Price of $1.48 is lower than the Exercise Price of $1.5, making the Warrant worthless," Dkt. No. 45 at 12, is incorrect.  Further, AppTech's calculation of the Market Price is also incorrect.  EMA exercised its Notice of Exercise on July 13, 2021.  The Warrant states that the "'Market Price' shall mean the closing sale price per share of Common Stock on the principal market where the Common Stock is traded on the Trading Day immediately preceding delivery of the Notice of Exercise . . . ."[6]  Therefore, the Market Price is the closing sale price on July 12, 2021, which was

---

[6] AppTech also contends that there are no damages under the Warrant because of a reverse stock

17

undisputedly $1.56 after adjustment from the AppTech's subsequent reverse stock split. When applied to the equation with the Market Price in the denominator, that yields $427,999.39. The application of Delaware's statutory interest rate yields a total of $31,932.86 as of October 27, 2022 based on EMA's representation of interim increases in the federal reserve discount rate. Dkt. No. 44-4. *Montgomery Cellular Holding Co. v. Dobler*, 880 A.2d 206, 225 (Del. 2005) (allowing for adoption of a varying rate due to changes in the federal discount rate).

In summary, the damages due to breach of the Warrant are $427,999.39 plus additional interest at the Delaware statutory interest rate of 5% plus the Federal Reserve Discount Rate, to be adjusted as the Federal Reserve Discount Rate adjusts.

## CONCLUSION

The Clerk of Court is directed to enter judgment in the amount of $1,027,870.07, plus prejudgment interest accruing at a rate of 24% per annum on a principal amount of $299,935.34 between June 14, 2021 and the date that final judgment is entered, plus prejudgment interest accruing at a rate of 5% and the Federal Reserve Discount Rate per annum, to be adjusted as the Federal Reserve Discount Rate adjusts, on a principal amount of $427,999.39 between July 15, 2021 and the date that final judgment is entered.

EMA shall submit additional briefing on the reasonable attorneys' fees and costs to which it is entitled by December 5, 2022. *See* Dkt. No. 40 at 40.

SO ORDERED.

Dated: December 1, 2022
New York, New York

LEWIS J. LIMAN
United States District Judge

---

split that occurred on January 5, 2022. But that is irrelevant because EMA's Notice of Exercise took place on July 13, 2021 and prior to the reverse stock split.

18